## EXHIBITS TO REPLY

A.    **Scheduling Order in HomEq litigation before Judge O'Connell**

B.    **HomEq Motion for Stay before Judge O'Connell** (without exhibits)

C.    **Judge O'Connell Order denying stay**

D.    **Decision of Judge O'Connell denying Motion to Dismiss**

E.    **Scheduling Order in Carrington litigation before Judge Fais**

F.    **Scheduling Order in AHMSI litigation before Judge Sheward**

G.    **Carrington production correspondence examples** (without exhibits)

H.    **Discovery requests to HomEq** (cover letter, 1st page of Requests and subsequent communications)

I.    **Complaint filed by Attorney General against HomEq** (without exhibits)

J.    **HomEq/Ocwen definition of Servicer**

K.    **Pooling and Servicing Agreement duties of Servicer**

L.    **HomEq's proposed certification questions**

IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO

STATE OF OHIO,                                    CASE NO.  2009 CV 10136

        Plaintiff(s),                              JUDGE TIMOTHY N. O'CONNELL

-vs-                                              **FINAL PRETRIAL ORDER**

BARCLAY'S CAPITAL REAL ESTATE INC,

        Defendant(s).

*Montgomery County Common Pleas Court — General Division*

Pursuant to the pretrial scheduling conference held in this case, it is hereby ORDERED that the following deadline dates be established.  Terms, conditions, and requirements regarding the established deadlines are set forth in Rule 2.01, Section V.D.2. of the Local Rules of Practice and Procedures for the General Division of the Montgomery County Common Pleas Court.

DISCOVERY DEADLINES:

**September 24, 2010** PLAINTIFF(S) DISCLOSURE OF EXPERTS' (PDE)

**November 08, 2010** DEFENDANT(S) DISCLOSURE OF EXPERTS (DDE)

**July 25, 2011** COMPLETION OF ALL DISCOVERY (COD)

**April 25, 2011** FILING DEADLINE FOR MOTIONS TO ADD A NECESSARY PARTY (E.G. SUBROGATED INSURERS, ETC.)

MOTIONS FOR SUMMARY JUDGMENT:

**May 24, 2011** FILING DEADLINE (SJ)

RESPONSE FILED WITHIN 14 DAYS OF MOVANT'S FILING



STATE'S EXHIBIT
A
PENGAD 800-631-6989

MOVANT'S REPLIES FILED WITHIN 7 DAYS OF RESPONDENT'S FILING

TRIAL MATERIALS EXCHANGE:

**July 29, 2011** DEADLINE FOR TRIAL MATERIALS EXCHANGE (DTME)

**August 05, 2011** DEADLINE FOR OBJECTIONS TO TRIAL MATERIALS (DOTM)

**August 08, 2011** DEADLINE FOR FILING JOINT PRETRIAL STATEMENT (JPTS)

**July 26, 2011** DEADLINE FOR FILING DAUBERT CHALLENGES IS TEN WORKING DAYS PRIOR TO FINAL PRETRIAL CONFERENCE (DC)

PERPETUATION OF TRIAL TESTIMONY:

**August 08, 2011** PLAINTIFF(S) DEADLINE FOR TAKING OF PERPETUATION DEPOSITIONS (PDPD)

**August 15, 2011** DEFENDANT(S) DEADLINE FOR TAKING OF PERPETUATION DEPOSITIONS (DDPD)

**August 18, 2011** DEADLINE FOR FILING OF PERPETUATION DEPOSITIONS IS THREE WORKING DAYS PRIOR TO TRIAL (DPD)

**August 12, 2011** FINAL PRETRIAL CONFERENCE AT 9:00 AM IN CHAMBERS (FP)

The week of **August 22, 2011 and August 29, 2011** AT 9:00 A.M. JURY TRIAL (JT)

IT IS FURTHER ORDERED as follows:

## **FINAL PRETRIAL CONFERENCE**

This case is scheduled for final chambers pretrial conference on **August 12, 2011 at 9:00 am.**

**FAILURE TO APPEAR AT THE FINAL PRETRIAL CONFERENCE OR TRIAL, OR**

**FAILURE TO HAVE A WELL INFORMED SUBSTITUTE AVAILABLE, WILL RESULT IN**

**DISMISSAL OF THE ABSENT PARTIES' CLAIMS FOR FAILURE TO PROSECUTE UNDER**

2

**CIVIL RULE 41(B)(I), OR, IF APPROPRIATE, THE CASE WILL PROCEED WITHOUT THE ABSENT PARTY OR COUNSEL.  COUNSEL AND/OR PARTIES WHO FAIL TO APPEAR MAY ALSO BE SUBJECT TO OTHER APPROPRIATE SANCTIONS.**

<u>**TRIAL DATE**</u>

This case is scheduled for a jury trial on liability for the week of **<u>August 22, 2011 and</u>**

**<u>August 29, 2011 at 9:00 a.m.</u>** on a specific date determined by the Court. Jury lists and jury questionnaires

will be available to counsel in Jury Services after 2:00 p.m. on the Friday prior to the trial date.  For possible

early procurement of the list and questionnaires, please call 225-4704.

The parties will note the Court will not be in session on Monday afternoon (Tuesday if

Monday of trial week is a holiday) of the week set for trial due to the fact the Court has matters pertaining to

its criminal docket which will be taken care of at that time.

SO ORDERED:

_____

JUDGE TIMOTHY N. O'CONNELL

This document is electronically filed by using the Clerk of Courts' e-Filing system. The system will post a record of the filing to the e-Filing account "Notifications" tab of the following case participants:

ROSEMARY E. RUPERT
(614) 775-2554
Attorney for Plaintiff(s), State Of Ohio

ROBERT HART
(614) 466-1305
Attorney for Plaintiff(s), State Of Ohio

JEFFREY R. LOESER
(614) 728-1172
Attorney for Plaintiff(s), State Of Ohio

MICHAEL A. WEHRKAMP
(614) 227-2172
Attorney for Defendant(s), Barclay's Capital Real Estate Inc

JAMES CURPHEY
(614) 227-2047
Attorney for Defendant(s), Barclay's Capital Real Estate Inc

Copies of this document were sent to all parties listed below by ordinary mail:

SHERRI PETERSON, Bailiff (937) 225-4416 E-mail: petersos@montcourt.org Fax (937) 824-7998

fdl



General Divison
Montgomery County Common Pleas Court
41 N. Perry Street, Dayton, Ohio 45422

**Case Title:**  STATE OF OHIO vs BARCLAY'S CAPITAL REAL
ESTATE INC

**Case Number:**  2009 CV 10136

**Type:**  Final Pretrial Order

So Ordered

*Timothy N. O'Connell*

Timothy N. O'Connell

Electronically signed by toconnell on 2010-08-25 14:06:43     page 4 of 4

COURT OF COMMON PLEAS
Thursday, June 24, 2010 7:28:04 PM
CASE NUMBER: 2009 CV 10136 Docket ID: 15201152
GREGORY A BRUSH
CLERK OF COURTS MONTGOMERY COUNTY OHIO

## IN THE COURT OF COMMON PLEAS
### MONTGOMERY COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO, ex rel.<br>RICHARD CORDRAY<br>ATTORNEY GENERAL OF OHIO ) | |
| ) | |
| Plaintiff, ) | **Case No. 09 CV 10136** |
| ) | |
| v. ) | **Judge O'Connell** |
| ) | |
| BARCLAYS CAPITAL REAL ESTATE INC. )<br>d.b.a. HOMEQ SERVICING ) | |
| ) | |
| Defendant. ) | |

## MOTION TO STAY OF DEFENDANT
## BARCLAYS CAPITAL REAL ESTATE INC. d.b.a. HOMEQ SERVICING

Barclays Capital Real Estate Inc., d.b.a. HomEq Servicing ("HomEq"), by and through undersigned counsel, respectfully moves this Court to stay the above-captioned action pending a decision by the Supreme Court of Ohio of the questions certified by the United States District Court of the Northern District of Ohio in the related matter *Anderson v. Barclays Capital Real Estate Inc. d.b.a. HomEq Servicing*, Civ. Action No. 3:09-cv-2335 (N.D. Ohio). In *Anderson*, the Court has entered an Order indicating the federal district court's intent to certify questions regarding whether the Ohio Consumer Sales Practices Act ("CSPA") applies to mortgage servicers such as HomEq.

The legal issues that will be presented in the certified questions to the Supreme Court of Ohio are also key legal issues in this case. Because any dispositive ruling by the Supreme Court of Ohio regarding the applicability of the CSPA will be highly relevant in this case, a stay in this action pending such ruling is necessary and



STATE'S
EXHIBIT
B
PENGAD 800-631-6989

warranted in the interests of justice and judicial economy, and to ensure that the ultimate

outcome of this case is consistent with Ohio law as decided by the Supreme Court of

Ohio. A Memorandum in Support is set forth below.

Respectfully submitted,

/s/ *James D. Curphey*
James D. Curphey (0015832)
Michael A. Wehrkamp (0084942)
Porter Wright Morris & Arthur LLP
Huntington Center
41 South High Street
Columbus, OH 43215-6194
Phone: 614.227.2047
Fax: 614.227.2100
jcurphey@porterwright.com
mwehrkamp@porterwright.com

Of Counsel:

Benjamin B. Klubes
Victoria Holstein-Childress
BUCKLEYSANDLER LLP
1250 24th Street N.W., Suite 700
Washington, D.C. 20037
Phone: 202.349.8000
Fax: 202.349.8080

2

## MEMORANDUM IN SUPPORT

Barclays Capital Real Estate Inc. d.b.a. HomEq Servicing ("HomEq"), by and through undersigned counsel, respectfully moves this Court to stay the above-captioned action pending a decision by the Supreme Court of Ohio of questions presented on certification in *Anderson v. Barclays Capital Real Estate Inc. d.b.a HomEq Servicing*, Civ. Action No. 3:09-cv-2335 (N.D. Ohio) regarding the applicability of the Ohio Consumer Sales Practices Act, Ohio Revised Code § 1345.01 *et seq.*, to mortgage servicers such as HomEq. For the reasons that follow, this stay should be granted.

1. Plaintiff, State of Ohio, by and through the Ohio Attorney General Richard Cordray, filed this lawsuit with a two-count Complaint against HomEq alleging violations of the Ohio Consumer Sales Practices Act ("CSPA"), Ohio Revised Code § 1345.01 *et seq.* ("CSPA"). Plaintiff's Complaint is brought "under the authority vested in him by the Ohio [CSPA]," and Defendant HomEq contests that the statute applies to mortgage servicers.

2. Resolution of the claims alleged in the Complaint necessarily depends on whether the CSPA applies to mortgage servicers such as HomEq. On February 10, 2010, HomEq filed a motion to dismiss setting forth, among other things, why the CSPA does not apply to mortgage servicers.

3. In the similar case, *Anderson v. Barclays Capital Real Estate Inc. d.b.a HomEq Servicing*, Civ. Action No. 3:09-cv-2335 (N.D. Ohio) (Judge James G. Carr), Plaintiff Anderson has alleged virtually identical CSPA claims against HomEq, which HomEq moved to dismiss on the basis that the CSPA does not apply to mortgage servicers. (Plaintiff Anderson's Amended Complaint, Exhibit A). On June 18, 2010, Judge Carr

3

issued an order indicating that the Court will certify to the Supreme Court of Ohio the question whether the CSPA applies to mortgage servicers such as HomEq. (Exhibit B.) The Court has scheduled a telephonic conference with the parties to address, *inter alia*, the proposed language for the certified question. (*Id.*)

4. The legal issues that will be presented in the certified questions to the Supreme Court of Ohio represent the key legal principles involved in this matter; therefore, any ruling by the Supreme Court of Ohio on the certified questions will be highly relevant in this case. Accordingly, if the Supreme Court of Ohio determines that the CSPA does not apply to mortgage servicers such as HomEq, judgment should be rendered in favor HomEq in this matter.

5. In the interests of the parties and judicial economy, and to ensure consistent judgments, HomEq respectfully moves the Court to stay these proceedings until the Supreme Court of Ohio can decide the certified questions. *See State v. Hochhausler*, 76 Ohio St.3d 455, 464, 688 N.E.2d 457, 466 (1996) (power to grant stays is inherent to a court's jurisdiction, and essential to the orderly and efficient administration of justice); *State ex rel. Smith v. Friedman*, 22 Ohio St.2d 25, 26-27, 257 N.E.2d 386, 387-88 (1970) (holding that a stay is proper where the relief to be accorded in one action depends upon the outcome of another). Moreover, Ohio courts have consistently recognized that a stay is proper pending resolution by the Supreme Court of Ohio of potentially dispositive issues in a similar case, *see, e.g., Guerriero v. Dep't of Rehab. and Corr.*, 2002 WL 31160576, *3 (11th Dist. Sept. 27, 2002), and that the denial of a stay pending such potentially dispositive developments is an abuse of discretion, *see, e.g., Phillips v. Conrad*, 2002 WL 31840923, *4 (1st Dist. Dec. 20, 2002) ("Courts retain the power to

4

stay proceedings pending any potentially dispositive developments. Factors to consider when granting a stay include 'the efficiency and judicial economy that results from staying matters pending resolution of potentially dispositive developments.'").

6. Accordingly, HomEq respectfully requests that this Court take notice of the above certification of questions to the Supreme Court of Ohio in *Anderson*, and stay this matter pending the disposition of these certified questions. HomEq believes that the entry of a stay order will significantly reduce the burden placed upon the resources of this Court and avoid the possibility of a conflicting judgment which could be mooted by the Supreme Court's ruling. The interests of justice strongly suggest that the Court should enter an Order staying this action until the resolution of the certified questions in *Anderson*.

Respectfully submitted,

/s/ *James D. Curphey*
James D. Curphey (0015832)
Michael A. Wehrkamp (0084942)
Porter Wright Morris & Arthur LLP
Huntington Center
41 South High Street
Columbus, OH 43215-6194
Phone: 614.227.2047
Fax: 614.227.2100
jcurphey@porterwright.com
mwehrkamp@porterwright.com

Of Counsel:

Benjamin B. Klubes
Victoria Holstein-Childress
BUCKLEYSANDLER LLP
1250 24th Street N.W., Suite 700
Washington, D.C. 20037
Phone: 202.349.8000
Fax: 202.349.8080

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of June, 2010, I electronically filed

the foregoing Motion to Stay of Defendant Barclays Capital Real Estate Inc. d.b.a.

HomEq Servicing and its supporting Memorandum in Support with the Clerk of the

Court by using the ECF system. Notice of this filing will be sent by operation of the

Court's electronic filing system to the following parties:

>Robert M. Hart, Esq.
>Sarah Lynn, Esq.
>Mindy Worly, Esq.
>Rosemary E. Rupert, Esq.
>Assistant Attorneys General, State of Ohio
>Consumer Protection Section
>30 East Broad Street, 14th Floor
>Columbus, OH 43215
>*Counsel for Plaintiff*
>*Richard Cordray, Ohio Attorney General*

>/s/ *James D. Curphey*
>James D. Curphey

6

COURT OF COMMON PLEAS
Tuesday, July 13, 2010 2:59:55 PM
CASE NUMBER: 2009 CV 10136 Docket ID: 15250555
GREGORY A BRUSH
CLERK OF COURTS MONTGOMERY COUNTY OHIO

**Montgomery County Common Pleas Court**
General Division

## IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO
## CIVIL DIVISION

**STATE OF OHIO,**                     CASE NO.: 2009 CV 10136

        Plaintiff(s),          JUDGE TIMOTHY N. O`CONNELL

-vs-

**BARCLAY`S CAPITAL REAL ESTATE**      **DECISION, ORDER AND ENTRY**
**INC,**                                **OVERRULING DEFENDANT'S**
                                        **MOTION TO STAY**

        Defendant(s).

---

This matter is before the Court on Defendant Barclays Capital Real Estate Inc.'s

("Defendant") *Motion to Stay* filed on June 24, 2010. Plaintiff filed a *Memorandum in Opposition*

on July 8, 2010.

After duly considering the matter, the Court OVERRULES Defendant's *Motion to Stay*. It

does not appear, at this time, that the question of whether the Ohio Consumer Sales Practices Act

applies to mortgage servicers has been certified to the Supreme Court of Ohio. If that changes, the

Court would entertain a new motion to stay.

SO ORDERED:



_____
JUDGE TIMOTHY N. O`CONNELL

This document is electronically filed by using the Clerk of Courts' e-Filing system. The system will post a record of the filing to the e-Filing account "Notifications" tab of the following case participants:

ROSEMARY E RUPERT
(614) 775-2554
Attorney for Plaintiff(s), State Of Ohio

ROBERT HART
(614) 466-1305
Attorney for Plaintiff(s), State Of Ohio

JEFFREY R LOESER
(614) 728-1172
Attorney for Plaintiff(s), State Of Ohio

MICHAEL A WEHRKAMP
(614) 227-2172
Attorney for Defendant(s), Barclay`S Capital Real Estate Inc

JAMES CURPHEY
(614) 227-2047
Attorney for Defendant(s), Barclay`S Capital Real Estate Inc

Copies of this document were sent to all parties listed below by ordinary mail:

Sherri Peterson, Bailiff (937) 225-4416 petersos@montcourt.org

2



General Divison

Montgomery County Common Pleas Court

41 N. Perry Street, Dayton, Ohio 45422

**Case Title:**    STATE OF OHIO vs BARCLAY'S CAPITAL REAL ESTATE INC

**Case Number:**    2009 CV 10136

**Type:**    Decision Overruling Motion

So Ordered

*Timothy n. O'Connell*

Timothy N. O'Connell

Electronically signed by toconnell on 2010-07-13 15:00:13    page 3 of 3

COURT OF COMMON PLEAS
Thursday, September 16, 2010 2:04:40 PM
CASE NUMBER: 2009 CV 10136 Docket ID: 15447439
GREGORY A BRUSH
CLERK OF COURTS MONTGOMERY COUNTY OHIO
ELECTRONICALLY FILED

**Montgomery County Common Pleas Court**
General Division

## IN THE COMMON PLEAS COURT OF MONTGOMERY COUNTY, OHIO
## CIVIL DIVISION

**STATE OF OHIO,**

        Plaintiff(s),

-vs-

**BARCLAY'S CAPITAL REAL ESTATE INC,**

        Defendant(s).

CASE NO.:  2009 CV 10136

JUDGE TIMOTHY N. O'CONNELL

**DECISION, ORDER AND ENTRY OVERRULING DEFENDANT'S MOTION TO DISMISS**

This matter is before the Court on Defendant Barclay's Capital Real Estate Inc.'s ("Defendant") *Motion to Dismiss* filed on February 10, 2010.  Plaintiff filed a *Memorandum of Law in Response* on March 24, 2010.  Defendant filed a *Reply in Support* on April 12, 2010.

After duly considering the matter, the Court finds Plaintiff's arguments well-taken.  The Court finds the case of *Dowling v. Litton Loan Servicing* persuasive and adopts it herein.[1]  The Court held a conference with the parties on August 25, 2010, and orally OVERRULED Defendant's *Motion to Dismiss*.  Defendant's *Motion to Dismiss* is therefore OVERRULED.

SO ORDERED:

_____
JUDGE TIMOTHY N. O'CONNELL



STATE'S
EXHIBIT
D

This document is electronically filed by using the Clerk of Courts' e-Filing system. The system will post a record of the filing to the e-Filing account "Notifications" tab of the following case participants:

ROSEMARY E RUPERT
(614) 775-2554
Attorney for Plaintiff(s), State Of Ohio

ROBERT HART
(614) 466-1305
Attorney for Plaintiff(s), State Of Ohio

JEFFREY R LOESER
(614) 728-1172
Attorney for Plaintiff(s), State Of Ohio

MICHAEL A WEHRKAMP
(614) 227-2172
Attorney for Defendant(s), Barclay'S Capital Real Estate Inc

JAMES CURPHEY
(614) 227-2047
Attorney for Defendant(s), Barclay'S Capital Real Estate Inc

Copies of this document were sent to all parties listed below by ordinary mail:

BENJAMIN B. KLUBES
ATTORNEY(S) AT LAW
1250 24TH STREET, NW, SUITE 700
WASHINGTON, DC  20037

DOUGLAS ROGERS
ATTORNEY(S) AT LAW
30 EAST BROAD ST., 14TH FLOOR
COLUMBUS, OHIO 43215
(614) 466-7828
Attorney for Plaintiff(s), State of Ohio

Sherri Peterson, Bailiff (937) 225-4416 petersos@montcourt.org

---

[1]  *Dowling v. Litton Loan Servicing* (S.D. Ohio, 2006), 2006 U.S. Dist. LEXIS 87098.



General Divison
Montgomery County Common Pleas Court
41 N. Perry Street, Dayton, Ohio 45422

**Case Title:** STATE OF OHIO vs BARCLAY'S CAPITAL REAL ESTATE INC

**Case Number:** 2009 CV 10136

**Type:** Decision Overruling Motion

So Ordered

*Timothy N. O'Connell*

Timothy N. O'Connell

Electronically signed by toconnell on 2010-09-16 14:04:24    page 3 of 3

## IN THE COURT OF COMMON PLEAS
## FRANKLIN COUNTY, OHIO

State *ex rel.* Cordray, *et al*,      :

     Plaintiffs,      :      Case No. 09 CVH 07 11433

     :

v.      :      JUDGE FAIS

     :

Carrington Mortgage Services, LLC,      :

     Defendant.      :

### ENTRY AND ORDER AMENDING CASE SCHEDULE

Upon the agreement of all parties to this action, and for the purpose of providing the

parties with adequate time to complete discovery and prepare this matter for trial, the Court

hereby amends the case schedule as follows:

| | |
|---|---|
| Supplemental Witness Disclosure | October 15, 2010 |
| Discovery Cut-Off | December 3, 2010 |
| Dispositive Motions Filing Deadline | January 14, 2011 |
| Memorandum Contra Dispositive Motions | February 4, 2011 |
| Reply to Memorandum Contra | February 18, 2011 |
| Decisions on Motions | April 15, 2011 |
| Final Pre-Trial | May 9th, 2011 @ 9:00 a.m./p.m. |
| Trial | May 24th, 2011 @ 9:00 a.m./p.m. |

_____
Date

_____
Judge D. Fais

STATE'S
EXHIBIT
*E*

PENGAD 800-631-6989

APPROVED:

RICHARD CORDRAY
Attorney General of Ohio

_Robert M. Hart_

Robert M. Hart (0014854)
Jeffrey Loeser (0082124)
Assistant Attorney General
Consumer Protection Section
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
614.466.7828
614.466.8898 (facsimile)
Robert.hart@ohioattorneygeneral.gov

Counsel for Plaintiff,
Ohio Attorney General

_Matthew J. Lampke_ per auth RMH

Matthew J. Lampke (0067973)
Assistant Attorney General
30 East Broad Street, 26th Floor
Columbus, Ohio 43215-3400
614.466.2980 [telephone]
866.403.3979 [facsimile]
Matthew.Lampke@ohioattorneygeneral.gov

Counsel for Plaintiff,
Ohio Department of Commerce

_Kirk D. Jensen_ per auth RMH

James D. Curphey (0015832)
Megan E. Bailey (0081167)
PORTER WRIGHT MORRIS & ARTHUR
41 South High Street
Columbus, Ohio 43215-6194
Telephone: 614.227.2000
jcurphey@porterwright.com
mbailey@porterwright.com

Andrew L. Sandler *(pro hac vice)*
Benjamin B. Klubes *(pro hac vice)*
Kirk D. Jensen *(pro hac vice)*
BUCKLEYSANDER LLP
1250 24th Street NW, Suite 700
Washington, DC 20037
Telephone: 202.349.8000
asandler@buckleysandler.com
bklubes@buckleysandler.com
kjensen@buckleysandler.com

Counsel for Defendant
Carrington Mortgage Services, LLC

2

**COPY**

### IN THE COURT OF COMMON PLEAS
### FRANKLIN COUNTY, OHIO

FILED
COMMON PLEAS COURT
FRANKLIN CO., OHIO
'3 JUL -1 PH 3: 21
CLERK OF COURTS

American Home Mortgage Servicing, Inc.,

      Plaintiff,

    v.

State of Ohio, *et al.,*

      Defendants.

**CASE NO. 09CVH-11-16491**

**JUDGE SHEWARD**

### AGREED AMENDED CASE SCHEDULE

    Upon joint motion of the parties, and for good cause shown, the Joint Motion to Amend

Case Schedule is hereby GRANTED.  It is hereby ORDERED that the case schedule be amended

as follows:

| | |
|---|---|
| CASE FILED | 11/05/09 |
| INITIAL STATUS CONFERENCE | ****** |
| INITIAL JOINT DISCLOSURE OF ALL WITNESSES | Already submitted |
| SUPPLEMENTAL JOINT DISCLOSURE OF ALL WITNESSES | 12/03/10 |
| TRIAL CONFIRMATION DATE | 03/11/11 |
| NON-EXPERT DISCOVERY CUT-OFF | 04/15/11 |
| MUTUAL EXPERT DISCLOSURES (WITH REPORTS) | 04/29/11 |
| MUTUAL REBUTTAL EXPERT DISCLOSURES (WITH REPORTS) | 05/30/11 |
| EXPERT DISCOVERY CUT-OFF | 06/15/11 |
| DISPOSITIVE MOTIONS | 07/15/11 |
| DECISIONS ON MOTIONS | 09/09/11 |

- 5 -

COI-1441920v1



STATE'S
EXHIBIT
**F**

PENGAD 800-631-6989

FINAL PRETRIAL CONFERENCE/ORDER (OR BOTH)          10/06/11 8:30 A.M.

TRIAL ASSIGNMENT                                   11/07/11 9:00 A.M.

JUDGE SHEWARD

- 6 -



# RICHARD CORDRAY
### OHIO ATTORNEY GENERAL

VIA OVERNIGHT DELIVERY

September 10, 2010

James D. Curphey, Esq.
Megan E. Bailey, Esq.
Porter Wright Morris & Arthur, LLP
41 S. High Street
Columbus, Ohio 43215-6194

Andrew L. Sandler, Esq.
Benjamin B. Klubes, Esq.
Kirk D. Jensen, Esq.
BuckleySandler LLP
1250 24th Street NW, Suite 700
Washington, D.C. 20037

RE: State ex rel Cordray, et al. v. Carrington Mortgage Services,
Franklin County Common Pleas Court Case No. 09 CVH 07 11433

Counsel:

Enclosed please find an external hard drive containing over 40,000 pages of documents as Plaintiff Ohio Attorney General's third document production in response to Carrington's First Set of Interrogatories and First Request For Production of Documents. Attached as Exhibit A is an Index with a bate-stamp number range and discovery request reference number(s) for the documents produced on this hard drive. It is possible that some of these documents are also responsive to other CMS discovery requests.

Given the rapidly approaching December discovery cut-off date , the need to schedule depositions and the January dispositive motion deadline we would like to know when we can expect to receive additional documents from Carrington, especially documents related to the consumers identified on Exhibits A and B attached to our original discovery demand. We believe that with the entry of the SPO that all documents can be produced by the end of September and that depositions can occur in October and November. Regarding Carrington's production, we ask for confirmation or clarification of your position with respect to the following matters from our May 6, 2010 discovery meet and confer teleconference:

**Requests 1/9**: Upon clarification from us that the scope of the request only addressed Agreement borrowers listed on AGO Discovery Exhibit A, and the non-Agreement consumers listed on Exhibit B, you indicated that you would check with your client to determine if you would produce or not produce audio tapes of conversations between our consumers and your client's employees. We have a right to those tapes and would like confirmation that Carrington will produce them.

**Requests 20/21**: You indicated that it was "your understanding" that your client had no corporate resolutions responsive to these requests but that you would check. We would ask for a more definitive answer.

**Request 33**: When asked you indicated that you believed that the PSAs produced in response to this request were all of them—we would like a more definite statement as to whether or not what you produced is complete or not.

Consumer Protection Section
30 East Broad St 14th Fl • Columbus, Ohio 43215
PHONE 614.466-8831 • FAX 614.466-8898 • www.ag.state.oh.us



STATE'S
EXHIBIT
G

**Request 39**: During the teleconference you stated that CMS would not produce any "personnel, telephone or email directories" for current or former CMS employees involved in servicing, and that you believe California Civil Rules prevail over Ohio Civil Rules with respect to providing this information. We firmly believe that both current and former employees involved in servicing Ohio residential mortgage loans are potential witnesses and that we have the right to discover their identity and contact information from you. In an effort to resolve this discovery dispute we will narrow the request to former non-managerial employees who were involved in servicing Ohio residential mortgage loans.

**Request 41**: You indicated during our teleconference that CMS would not produce any documents in response to this request. In an effort to negotiate this discovery dispute the AGO will narrow the request to any investigations and resultant memorandum or reports related to servicing residential mortgage loans in Ohio, including loss mitigation activities.

**Request 52**: In response to this request you indicated that you would produce the Second Amended Purchase Agreement schedules and attachments only if they were not available from the court. We have confirmed that the schedules and attachments were not affixed to any filed documents publicly available to us and accordingly ask that CMS produce them.

**Request 58**: Upon our clarification that we were asking only for documents related to "charges" assessed by CMS against the 1030 loan modification borrowers, after the loan modifications were executed, and based upon provisions in the loan modification agreement, you indicated that you would speak to your client to determine if they would produce now that you understood more clearly what we were requesting. We would like to know if your client will be producing the documents we are requesting in this request as clarified by our communications.

**Requests 60/61**: During the teleconference you stated that you were "comfortable" with your assertion of a privilege on these requests but that you would reconsider if we would identify specific individuals. For now we request that you produce responsive documents for the following QLBs: Leon Hackworth [1001986444], Steven Reisinger [1003802415], Richard Becker [1001383229], Stacie Cole [1010276195] and Pamela Kuhn [1034999].

**Interrogatory 2**: When we asked if CMS would be producing written repayment and forbearance agreements, which are included in the AGO's discovery definition of "workout agreement," you indicated that you would go back to your client to determine if there were any. Are there written repayment and/or forbearance agreements responsive to this request, and will CMS produce them?

**Interrogatory 8**: In the CMS discovery response you stated CMS would produce Fiserve's Loan Servicing Platform Manual once you gave notice to Fiserve and gave them an opportunity to object or obtain a protective order. As of our May 6, 2010 "meet and confer" you were going to check on the notice. Given the passage of time and the filing of the Stipulated Protective Order we would like you to confirm that CMS will be producing the responsive documents, especially the fields and codes used in the CMS servicing operation as that will be the only way we have of deciphering internal CMS payment and comment histories.

**Interrogatory 15**: With the SPO in place we request that you provide a revised response to this interrogatory without the redactions.

**Interrogatory 26**: In an effort to reach a resolution to the discovery dispute over this interrogatory the AGO will limit the request to the individuals on behalf of CMS who reviewed and approved the CMS Answer. The identity of the individuals who have direct knowledge of the various factual representations contained in the 13 page narrative in the CMS Answer that

preceded CMS' actual paragraph specific responses to the AGO complaint allegations are clearly fact witnesses whose identity we are entitled to discover.

The AGO will be producing additional documents responsive to the CMS discovery demands, and a supplemental written response, in the near future. We look forward to receiving additional documents and responsive information from CMS. Please contact me should you have any questions regarding this matter.

Sincerely,
RICHARD CORDRAY
OHIO ATTORNEY GENERAL

Robert M. Hart, AAG
Consumer Protection Section
30 E. Broad Street, 14th Floor
Columbus, Ohio 43215
614.466.7828 [Telephone]
614.466.8898 [Facsimile]

Encl.
cc: Matt Lampke, Ohio DOC Counsel

3

# BUCKLEY SANDLER LLP

**Kirk D. Jensen**

1250 24th Street NW, Suite 700
Washington, DC 20037

kjensen@buckleysandler.com
202.349.8048

September 17, 2010

**Via Federal Express**

Robert M. Hart, Esq.
Jeffrey Loeser, Esq.
Assistant Attorneys General
Consumer Protection Section
Ohio Attorney General's Office
30 East Broad Street, 14th Floor
Columbus, OH 43215

Matthew J. Lampke, Esq.
Assistant Section Chief
Executive Agencies Section
Ohio Attorney General's Office
30 East Broad Street, 26th Floor
Columbus, OH 43215

**Re:     Carrington Mortgage Services, LLC**

Dear Messrs. Hart, Loeser and Lampke:

Enclosed please find a production of materials responsive to the Plaintiff Ohio
Attorney General's First Requests for Production of Documents and First Set of
Interrogatories. This production includes a CD containing documents bates-numbered
CMS0014644 to CMS0028505 in OCR searchable format as agreed between the parties.
The CD is password protected, and the password is Ww4!t2SYh\4nf^ (cap sensitive).
We will provide a privilege log related to this production early next week. We also
intend to provide a written response to your letter dated September 10, 2010 early next
week, so that we may continue with our meet and confer.

The documents contained on the CD are responsive to the following discovery requests:

| Beg Bates | End Bates | Responsive to |
|-----------|-----------|---------------|
| CMS0014644 | CMS0014665 | RFP 1, 9 |
| CMS0014666 | CMS0014680 | RFP 1, 9 |

Robert M. Hart, Esq.
Jeffrey Loeser, Esq.
Matthew J. Lampke, Esq.
September 17, 2010
Page 2

| Beg Bates | End Bates | Responsive to |
|-----------|-----------|---------------|
| CMS0014681 | CMS0014685 | RFP 1, 9 |
| CMS0014686 | CMS0014691 | RFP 1, 9 |
| CMS0014692 | CMS0014711 | RFP 1, 9 |
| CMS0014712 | CMS0014714 | RFP 1, 9 |
| CMS0014715 | CMS0014734 | RFP 1, 9 |
| CMS0014735 | CMS0014738 | RFP 1, 9 |
| CMS0014739 | CMS0014749 | RFP 1, 9 |
| CMS0014750 | CMS0014751 | RFP 1, 9 |
| CMS0014752 | CMS0014773 | RFP 1, 9 |
| CMS0014774 | CMS0014794 | RFP 1, 9 |
| CMS0014795 | CMS0014801 | RFP 1, 9 |
| CMS0014802 | CMS0014818 | RFP 1, 9 |
| CMS0014819 | CMS0014823 | RFP 1, 9 |
| CMS0014824 | CMS0014834 | RFP 1, 9 |
| CMS0014835 | CMS0014841 | RFP 1, 9 |
| CMS0014842 | CMS0014853 | RFP 1, 9 |
| CMS0014854 | CMS0014857 | RFP 1, 9 |
| CMS0014858 | CMS0014881 | RFP 1, 9 |
| CMS0014882 | CMS0014892 | RFP 1, 9 |
| CMS0014893 | CMS0014902 | RFP 1, 9 |
| CMS0014903 | CMS0014911 | RFP 1, 9 |
| CMS0014912 | CMS0014917 | RFP 1, 9 |
| CMS0014918 | CMS0014930 | RFP 1, 9 |
| CMS0014931 | CMS0014942 | RFP 1, 9 |
| CMS0014943 | CMS0014949 | RFP 1, 9 |
| CMS0014950 | CMS0014960 | RFP 1, 9 |
| CMS0014961 | CMS0014968 | RFP 1, 9 |
| CMS0014969 | CMS0014980 | RFP 1, 9 |
| CMS0014981 | CMS0014983 | RFP 1, 9 |
| CMS0014984 | CMS0014989 | RFP 1, 9 |
| CMS0014990 | CMS0015010 | RFP 1, 9 |
| CMS0015011 | CMS0015012 | RFP 1, 9 |
| CMS0015013 | CMS0015034 | RFP 1, 9 |
| CMS0015035 | CMS0015045 | RFP 1, 9 |
| CMS0015046 | CMS0015050 | RFP 1, 9 |
| CMS0015051 | CMS0015069 | RFP 1, 9 |

Robert M. Hart, Esq.
Jeffrey Loeser, Esq.
Matthew J. Lampke, Esq.
September 17, 2010
Page 3

| Beg Bates | End Bates | Responsive to |
|---|---|---|
| CMS0015070 | CMS0015109 | RFP 1, 9 |
| CMS0015110 | CMS0015125 | RFP 1, 9 |
| CMS0015126 | CMS0015140 | RFP 1, 9 |
| CMS0015141 | CMS0015150 | RFP 1, 9 |
| CMS0015151 | CMS0015163 | RFP 1, 9 |
| CMS0015164 | CMS0015191 | RFP 1, 9 |
| CMS0015192 | CMS0015199 | RFP 1, 9 |
| CMS0015200 | CMS0015211 | RFP 1, 9 |
| CMS0015212 | CMS0015221 | RFP 1, 9 |
| CMS0015222 | CMS0015226 | RFP 1, 9 |
| CMS0015227 | CMS0015232 | RFP 1, 9 |
| CMS0015233 | CMS0015257 | RFP 1, 9 |
| CMS0015258 | CMS0015284 | RFP 1, 9 |
| CMS0015285 | CMS0015293 | RFP 1, 9 |
| CMS0015294 | CMS0015299 | RFP 1, 9 |
| CMS0015300 | CMS0015320 | RFP 1, 9 |
| CMS0015321 | CMS0015328 | RFP 1, 9 |
| CMS0015329 | CMS0015347 | RFP 1, 9 |
| CMS0015348 | CMS0015356 | RFP 1, 9 |
| CMS0015357 | CMS0015369 | RFP 1, 9 |
| CMS0015370 | CMS0015374 | RFP 1, 9 |
| CMS0015375 | CMS0015446 | RFP 1, 9 |
| CMS0015447 | CMS0015527 | RFP 1, 9 |
| CMS0015528 | CMS0015620 | RFP 1, 9 |
| CMS0015621 | CMS0015701 | RFP 1, 9 |
| CMS0015702 | CMS0015766 | RFP 1, 9 |
| CMS0015767 | CMS0015834 | RFP 1, 9 |
| CMS0015835 | CMS0015893 | RFP 1, 9 |
| CMS0015894 | CMS0016014 | RFP 1, 9 |
| CMS0016015 | CMS0016063 | RFP 1, 9 |
| CMS0016064 | CMS0016148 | RFP 1, 9 |
| CMS0016149 | CMS0016263 | RFP 1, 9 |
| CMS0016264 | CMS0016328 | RFP 1, 9 |
| CMS0016329 | CMS0016515 | RFP 1, 9 |
| CMS0016516 | CMS0016573 | RFP 1, 9 |
| CMS0016574 | CMS0016648 | RFP 1, 9 |

Robert M. Hart, Esq.
Jeffrey Loeser, Esq.
Matthew J. Lampke, Esq.
September 17, 2010
Page 4

| Beg Bates | End Bates | Responsive to |
|---|---|---|
| CMS0016649 | CMS0016772 | RFP 1, 9 |
| CMS0016773 | CMS0016874 | RFP 1, 9 |
| CMS0016875 | CMS0016935 | RFP 1, 9 |
| CMS0016936 | CMS0016994 | RFP 1, 9 |
| CMS0016995 | CMS0017085 | RFP 1, 9 |
| CMS0017086 | CMS0017199 | RFP 1, 9 |
| CMS0017200 | CMS0017427 | RFP 1, 9 |
| CMS0017428 | CMS0017524 | RFP 1, 9 |
| CMS0017525 | CMS0017624 | RFP 1, 9 |
| CMS0017625 | CMS0017683 | RFP 1, 9 |
| CMS0017684 | CMS0017884 | RFP 1, 9 |
| CMS0017885 | CMS0017962 | RFP 1, 9 |
| CMS0017963 | CMS0018041 | RFP 1, 9 |
| CMS0018042 | CMS0018156 | RFP 1, 9 |
| CMS0018157 | CMS0018216 | RFP 1, 9 |
| CMS0018217 | CMS0018322 | RFP 1, 9 |
| CMS0018323 | CMS0018484 | RFP 1, 9 |
| CMS0018485 | CMS0018552 | RFP 1, 9 |
| CMS0018553 | CMS0018623 | RFP 1, 9 |
| CMS0018624 | CMS0018679 | RFP 1, 9 |
| CMS0018680 | CMS0018786 | RFP 1, 9 |
| CMS0018787 | CMS0018927 | RFP 1, 9 |
| CMS0018928 | CMS0019016 | RFP 1, 9 |
| CMS0019017 | CMS0019125 | RFP 1, 9 |
| CMS0019126 | CMS0019216 | RFP 1, 9 |
| CMS0019217 | CMS0019376 | RFP 1, 9 |
| CMS0019377 | CMS0019464 | RFP 1, 9 |
| CMS0019465 | CMS0019525 | RFP 1, 9 |
| CMS0019526 | CMS0019701 | RFP 1, 9 |
| CMS0019702 | CMS0019764 | RFP 1, 9 |
| CMS0019765 | CMS0019865 | RFP 1, 9 |
| CMS0019866 | CMS0019924 | RFP 1, 9 |
| CMS0019925 | CMS0019988 | RFP 1, 9 |
| CMS0019989 | CMS0020060 | RFP 1, 9 |
| CMS0020061 | CMS0020129 | RFP 1, 9 |
| CMS0020130 | CMS0020184 | RFP 1, 9 |

Robert M. Hart, Esq.
Jeffrey Loeser, Esq.
Matthew J. Lampke, Esq.
September 17, 2010
Page 5

| Beg Bates | End Bates | Responsive to |
|---|---|---|
| CMS0020185 | CMS0020285 | RFP 1, 9 |
| CMS0020286 | CMS0020344 | RFP 1, 9 |
| CMS0020345 | CMS0020409 | RFP 1, 9 |
| CMS0020410 | CMS0020470 | RFP 1, 9 |
| CMS0020471 | CMS0020591 | RFP 1, 9 |
| CMS0020592 | CMS0020714 | RFP 1, 9 |
| CMS0020715 | CMS0020779 | RFP 1, 9 |
| CMS0020780 | CMS0020916 | RFP 1, 9 |
| CMS0020917 | CMS0020970 | RFP 1, 9 |
| CMS0020971 | CMS0021107 | RFP 1, 9 |
| CMS0021108 | CMS0021287 | RFP 1, 9 |
| CMS0021288 | CMS0021422 | RFP 1, 9 |
| CMS0021423 | CMS0021529 | RFP 1, 9 |
| CMS0021530 | CMS0021599 | RFP 1, 9 |
| CMS0021600 | CMS0021648 | RFP 1, 9 |
| CMS0021649 | CMS0021687 | RFP 1, 9 |
| CMS0021688 | CMS0021736 | RFP 1, 9 |
| CMS0021737 | CMS0021797 | RFP 1, 9 |
| CMS0021798 | CMS0021905 | RFP 1, 9 |
| CMS0021906 | CMS0021978 | RFP 1, 9 |
| CMS0021979 | CMS0022055 | RFP 1, 9 |
| CMS0022056 | CMS0022157 | RFP 1, 9 |
| CMS0022158 | CMS0022244 | RFP 1, 9 |
| CMS0022245 | CMS0022345 | RFP 1, 9 |
| CMS0022346 | CMS0022417 | RFP 1, 9 |
| CMS0022418 | CMS0022443 | RFP 1, 9 |
| CMS0022444 | CMS0022506 | RFP 1, 9 |
| CMS0022507 | CMS0022509 | RFP 1, 9 |
| CMS0022510 | CMS0022511 | RFP 1, 9 |
| CMS0022512 | CMS0022521 | RFP 1, 9 |
| CMS0022522 | CMS0022568 | RFP 1, 9 |
| CMS0022569 | CMS0022626 | RFP 1, 9 |
| CMS0022627 | CMS0022641 | RFP 1, 9 |
| CMS0022642 | CMS0022719 | RFP 1, 9 |
| CMS0022720 | CMS0022723 | RFP 1, 9 |
| CMS0022724 | CMS0022839 | RFP 1, 9 |

Robert M. Hart, Esq.
Jeffrey Loeser, Esq.
Matthew J. Lampke, Esq.
September 17, 2010
Page 6

| Beg Bates | End Bates | Responsive to |
|-----------|-----------|---------------|
| CMS0022840 | CMS0022896 | RFP 1, 9 |
| CMS0022897 | CMS0023001 | RFP 1, 9 |
| CMS0023002 | CMS0023099 | RFP 1, 9 |
| CMS0023100 | CMS0023155 | RFP 1, 9 |
| CMS0023156 | CMS0023209 | RFP 1, 9 |
| CMS0023210 | CMS0023228 | RFP 1, 9 |
| CMS0023229 | CMS0023274 | RFP 1, 9 |
| CMS0023275 | CMS0023337 | RFP 1, 9 |
| CMS0023338 | CMS0023421 | RFP 1, 9 |
| CMS0023422 | CMS0023462 | RFP 1, 9 |
| CMS0023463 | CMS0023510 | RFP 1, 9 |
| CMS0023511 | CMS0023566 | RFP 1, 9 |
| CMS0023567 | CMS0023626 | RFP 1, 9 |
| CMS0023627 | CMS0023683 | RFP 1, 9 |
| CMS0023684 | CMS0023767 | RFP 1, 9 |
| CMS0023768 | CMS0023839 | RFP 1, 9 |
| CMS0023840 | CMS0023889 | RFP 1, 9 |
| CMS0023890 | CMS0023949 | RFP 1, 9 |
| CMS0023950 | CMS0024001 | RFP 1, 9 |
| CMS0024002 | CMS0024145 | RFP 1, 9 |
| CMS0024146 | CMS0024241 | RFP 1, 9 |
| CMS0024242 | CMS0024324 | RFP 1, 9 |
| CMS0024325 | CMS0024369 | RFP 1, 9 |
| CMS0024370 | CMS0024439 | RFP 1, 9 |
| CMS0024440 | CMS0024517 | RFP 1, 9 |
| CMS0024518 | CMS0024585 | RFP 1, 9 |
| CMS0024586 | CMS0024654 | RFP 1, 9 |
| CMS0024655 | CMS0024728 | RFP 1, 9 |
| CMS0024729 | CMS0024827 | RFP 1, 9 |
| CMS0024828 | CMS0024858 | RFP 1, 9 |
| CMS0024859 | CMS0024931 | RFP 1, 9 |
| CMS0024932 | CMS0024994 | RFP 1, 9 |
| CMS0024995 | CMS0025078 | RFP 1, 9 |
| CMS0025079 | CMS0025112 | RFP 1, 9 |
| CMS0025113 | CMS0025160 | RFP 1, 9 |
| CMS0025161 | CMS0025201 | RFP 1, 9 |

Robert M. Hart, Esq.
Jeffrey Loeser, Esq.
Matthew J. Lampke, Esq.
September 17, 2010
Page 7

| Beg Bates | End Bates | Responsive to |
|-----------|-----------|---------------|
| CMS0025202 | CMS0025278 | RFP 1, 9 |
| CMS0025279 | CMS0025329 | RFP 1, 9 |
| CMS0025330 | CMS0025384 | RFP 1, 9 |
| CMS0025385 | CMS0025502 | RFP 1, 9 |
| CMS0025503 | CMS0025606 | RFP 1, 9 |
| CMS0025607 | CMS0025698 | RFP 1, 9 |
| CMS0025699 | CMS0025701 | RFP 1, 9 |
| CMS0025702 | CMS0025780 | RFP 1, 9 |
| CMS0025781 | CMS0025894 | RFP 1, 9 |
| CMS0025895 | CMS0025966 | RFP 1, 9 |
| CMS0025967 | CMS0026028 | RFP 1, 9 |
| CMS0026029 | CMS0026048 | RFP 1, 9 |
| CMS0026049 | CMS0026190 | RFP 1, 9 |
| CMS0026191 | CMS0026203 | RFP 1, 9 |
| CMS0026204 | CMS0026224 | RFP 1, 9 |
| CMS0026225 | CMS0026257 | RFP 1, 9 |
| CMS0026258 | CMS0026394 | RFP 1, 9 |
| CMS0026395 | CMS0026419 | RFP 1, 9 |
| CMS0026420 | CMS0026438 | RFP 1, 9 |
| CMS0026439 | CMS0026458 | RFP 1, 9 |
| CMS0026459 | CMS0026482 | RFP 1, 9 |
| CMS0026483 | CMS0026498 | RFP 1, 9 |
| CMS0026499 | CMS0026521 | RFP 1, 9 |
| CMS0026522 | CMS0026543 | RFP 1, 9 |
| CMS0026544 | CMS0026572 | RFP 1, 9 |
| CMS0026573 | CMS0026586 | RFP 1, 9 |
| CMS0026587 | CMS0026623 | RFP 1, 9 |
| CMS0026624 | CMS0026677 | RFP 1, 9 |
| CMS0026678 | CMS0026792 | RFP 1, 9 |
| CMS0026793 | CMS0026852 | RFP 1, 9 |
| CMS0026853 | CMS0026933 | RFP 1, 9 |
| CMS0026934 | CMS0027042 | RFP 1, 9 |
| CMS0027043 | CMS0027092 | RFP 1, 9 |
| CMS0027093 | CMS0027165 | RFP 1, 9 |
| CMS0027166 | CMS0027248 | RFP 1, 9 |
| CMS0027249 | CMS0027358 | RFP 1, 9 |

Robert M. Hart, Esq.
Jeffrey Loeser, Esq.
Matthew J. Lampke, Esq.
September 17, 2010
Page 8

| Beg Bates | End Bates | Responsive to |
|-----------|-----------|---------------|
| CMS0027359 | CMS0027423 | RFP 1, 9 |
| CMS0027424 | CMS0027514 | RFP 1, 9 |
| CMS0027515 | CMS0027553 | RFP 1, 9 |
| CMS0027554 | CMS0027621 | RFP 1, 9 |
| CMS0027622 | CMS0027649 | RFP 1, 9 |
| CMS0027650 | CMS0027791 | RFP 1, 9 |
| CMS0027792 | CMS0027940 | RFP 1, 9 |
| CMS0027941 | CMS0028016 | RFP 1, 9 |
| CMS0028017 | CMS0028093 | RFP 1, 9 |
| CMS0028094 | CMS0028164 | RFP 1, 9 |
| CMS0028165 | CMS0028305 | RFP 1, 9 |
| CMS0028306 | CMS0028437 | RFP 1, 9 |
| CMS0028438 | CMS0028505 | RFP 1, 9 |

It is possible that some of these documents are also responsive to additional discovery requests.

        This production has been stamped "CONFIDENTIAL," and we ask that you treat this production with confidentiality pursuant to the terms of the Protective Order entered in this matter.  To the extent that such a confidentiality marking is not present on any documents produced herewith, that omission is inadvertent, and we request confidential treatment with respect to such documents as well.  In the event that there are any requests for public disclosure of these or any other documents provided by CMS, under the Freedom of Information Law or for any other reason, we would expect to be notified in advance and to be allowed to substantiate our claim of confidentiality.

        Please do not hesitate to call if you have any questions about the enclosed materials.

                                            Sincerely,

                                            Kirk D. Jensen

encl.

# RICHARD CORDRAY
## OHIO ATTORNEY GENERAL

August 19, 2010

Benjamin B. Klubes
Attorney at Law
Buckley Sandler LLP
Huntington Center
1250 24th Street N.W., Suite 700
Washington D.C. 20037

Subject: ***State ex rel Cordray v. Barclays Capital Real Estate, Inc. dba
HomEq Servicing,*** Montgomery County Case No. 09-CV-10136

Dear Mr. Klubes:

Enclosed please find a copy of Plaintiff Ohio Attorney General's First Request for Production of Documents and First Set of Interrogatories to Defendant Barclays Capital Real Estate, Inc., dba HomEq Servicing.

If you have any questions, please feel free to contact me.

Sincerely yours,

RICHARD CORDRAY
OHIO ATTORNEY GENERAL



Rosemary E. Rupert
Assistant Attorney General
Consumer Protection Section
Telephone: 614.752.5548
Fax: 614.466.8898
rosemaryrupert@ohioattorneygeneral.gov

Encl.

cc:     Victoria Holstein-Childress
        James Curphey
        Michael Wehrkamp

> STATE'S
> EXHIBIT
> **H**
> PENGAD 800-631-6989

Consumer Protection Section
30 East Broad St  14th Fl ● Columbus, Ohio 43215
PHONE 614.466-8831 ● FAX 614.466-8898 ● www.ag.state.oh.us

## IN THE COURT OF COMMON PLEAS
## MONTGOMERY COUNTY, OHIO

| | |
|---|---|
| STATE OF OHIO, ex rel., | ) |
| RICHARD CORDRAY | ) CASE NO. 2009-CVH 10136 |
| ATTORNEY GENERAL OF OHIO | ) |
| | ) JUDGE O'CONNELL |
| Plaintiff, | ) |
| | ) **PLAINTIFF OHIO ATTORNEY** |
| v. | ) **GENERAL'S FIRST REQUEST FOR** |
| | ) **PRODUCTION OF DOCUMENTS AND** |
| BARCLAYS CAPITAL REAL | ) **FIRST SET OF INTERROGATORIES** |
| ESTATE, INC., dba HOMEQ SERVICING | ) **TO DEFENDANT BARCLAYS** |
| | ) **CAPITAL REAL ESTATE, INC.,** |
| | ) **dba HOMEQ SERVICING** |
| Defendant. | ) |

Plaintiff State of Ohio, by and through its counsel, Attorney General Richard Cordray, pursuant to Civil Rule 34, requests that Defendant Barclays Capital Real Estate, Inc. dba HomEq Servicing, answer the following interrogatories, and produce for inspection and copying the following documents or items which are in Defendant's possession, custody or control or that of its attorneys, agents or representatives. Such production is to take place at the offices of the Attorney General of Ohio, Consumer Protection Section, 30 E. Broad Street, 14th Floor, Columbus, Ohio 43215-3428, or at such other place as is agreed to by the parties.

### DEFINITIONS AND INSTRUCTIONS

1.     The terms "you," "your, "defendant" and "HomEq" refer to Barclays Capital Real Estate, Inc. dba HomEq Servicing, its domestic and foreign parents, predecessors, divisions, subsidiaries, affiliates, partnerships and joint ventures, and all officers, directors, employees, attorneys, agents, representatives, and independent contractors of the foregoing. The terms "affiliate," "subsidiary" and "joint venture" refer to any entity or person in which there is 25% or more ownership or control between Barclays Capital Real Estate, Inc. dba HomEq Servicing, and any other entity/person. "Control" of another entity means ownership or power to vote 25% or

## Douglas Rogers

| | |
|---|---|
| **From:** | Douglas Rogers |
| **Sent:** | Friday, September 17, 2010 3:45 PM |
| **To:** | 'Klubes, Benjamin B.'; jcurphey@porterwright.com |
| **Cc:** | Robert M. Hart; Rosemary E. Rupert; Jeff Loeser |
| **Subject:** | RE: State ex rel. v. Barclay's Capital Real Estate Inc. (Montgomery Cty. Case) |

Benjamin B. Klubes
BuckleySandler LLP
1250 24th Street, N.W. Suite 700
Washington, D.C. 20037
bklubes@buckleysandler.com

James D. Curphy
Porter Wright Morris & Arthur LLP
Huntington Center
41 South High Street
Columbus, Ohio 43215-6194
jcurphy@porterwright.com

> Re:  State of Ohio ex rel. Cordray v. Barclays Capital Real Estate Inc, dba HomEq ("HomEq")

Dear Ben:

Thanks for your e-mail earlier today. You mention a "rolling production," which of course is not unusual in this type of case. Of course, we cannot predict whether we will think HomEq's production on the 20th puts off more of the production for some unspecified later date than is warranted until we see what HomEq produces on the 20th. Nevertheless, we consent to HomEq producing documents and otherwise responding to the Attorney General's First Request for Production of Documents and First Set of Interrogatories ("First Request"), starting on October 20, subject to our request set forth below for certain documents next week.

We have reviewed the Asset Purchase Agreement ("APA") dated May 28, 2010 among Barclays Bank, PLC ("Bank"), Barclays Capital Real Estate Inc. ("HomEq") (Bank and HmEq collectively "Sellers") and Ocwen Loan Servicing, LLC ("Ocwen") that Andrew Wein of Ocwen sent to me without the exhibits. We notice from the APA that a number or responsive documents must exist and must be easy for HomEq to collect now.  We think those documents should be produced next week.  Specifically:

> §3.10-(ii)(A) of the APA—"except as previously disclosed to the Purchaser prior to the date hereof in the **Consumer Relations reports** for 2008, 2009 and 2010 available through the Tumbleweed System with respect to complaints made by or on behalf of any Mortgagors ... , no written notice has been received by either Seller or its Affiliates from any Governmental Authority alleging a material violation of any of the foregoing...."

**We request that Ocwen produce next week all Consumer Relations**

**reports** for 2008, 2009 and 2010 available through the Tumbleweed System with respect to complaints made by or on behalf of any Mortgagors in Ohio, including the consumers listed on Exhibit A to the First Request. *See, e.g.,* Request 1 and 14.

§5.13(a) of the APA—"Each of the Sellers and Purchaser shall work together in good faith to develop a plan prior to the Closing Date (the '**Conversion Plan')** to effect the orderly transfer of the Loan Files and Servicing files, the physical transfer of Servicing, and the provision of customary notices to taxing authorities, insurance providers, escrow arrangements and the like."

One of the great problems with HomEq's servicing has been the loss of documents and other communications sent by consumers to HomEq (*see, e.g.,* ¶¶16a and 18 of the Complaint). Further transfer of those files could result in additional losses for consumers.

**We request that Ocwen produce next week the Conversion Plan.** See, e.g., Requests 1, 2, 9, 10 , 21 and 22.

§5.15 of the APA—"The Sellers shall pay interest on Custodial Accounts or Related Escrow Accounts accrued through to the Closing to the extent interest with respect to such accounts is required to be paid under Applicable Requirements <u>for the benefit of Mortgagors</u> under the Mortgage Loans or any other appropriate party. The Sellers shall either deposit any such interest earned in the Custodial Accounts or Related Escrow Accounts or forward such interest to the Purchaser or its designee with in five Business Days after the Closing." (Emphasis added)

For Ohio consumers, we want an accounting of that interest and the crediting of that interest for the benefit of the accounts of the Ohio consumers, but this can be produced in connection with the October 20 rolling production. *See, e.g.,* Request 11.

§5.16 of the APA—"After the Closing, at the direction of the Sellers, the Purchaser shall complete the process of preparing, recording and providing to Mortgagors lien releases with respect to Mortgage Loans serviced or subserviced by the Sellers prior to and paid off as of the Closing Date...."

Please provide as part of your response to Request 1 any such communications you send to Mortgagors on Exhibit A, but HomEq can provide such communications in connection with its October 20 rolling production.

§5.20(a) of the APA—"Promptly after the date hereof, the parties hereto shall negotiate [sic] reasonably and in good faith agree upon (in no event later than 30 calendar days after the date hereof) a form of a transition services agreement consistent with the terms and conditions set forth in Exhibit 5.20, pursuant to which the Sellers or their Affiliates shall provide to the Purchaser certain specified services for up to 90 days following the Closing Date (the '**Transition Services Agreement')**." (Emphasis added)

The litigation against HomEq challenges both the past and future servicing of HomEq, and this Transition Services Agreement is evidence of the

nature of the servicing HomEq will be providing for 90 days after the Closing (90 days after Cl;osing would be around December 1). **We request that Ocwen produce next week the Transition Services Agreement.** *See, e.g.,* Requests 1 and 2.

§6.01 of the APA refers to the transfer of HomEq employees to Ocwen. Reports I have seen on the Internet indicate that Ocwen will be laying of those employees by the end of November and has sent out WARN notices to those employees. Request 17 asks for "All organizational charts, personnel, telephone and e-mail directories for HomEq that identify and include all persons who are, or have been, involved in any way in the servicing of Ohio loans."

In order that the sale of the HomEq platform to Ocwen not cause the Attorney General and his staff to lose the ability to contact and interview the HomEq employees who were involved in servicing Ohio loans, and who are no longer, or soon will no longer be, HomEq employees, **we request that HomEq provide next week the contact information for persons who are, or have been, involved in any way in the servicing of Ohio loans for HomEq.**

Finally, we do not know if HomEq plans on transferring all of its assets, including the proceeds from the APA to its parent in England. If that might occur it could present a problem with collecting any judgment against HomEq in this litigation, and we would need to consider possible responses. Please let us know in what financial institution the Holdbank Amount ($3,500,000) is being held and who the Escrow Agent for the APA is.

We look forward to receiving the documents requested above and to HomEq's rolling production otherwise starting on October 20. Thank you very much, and please let me know if you have any questions or concerns.

Doug Rogers

.

---

**From:** Klubes, Benjamin B. [mailto:BKlubes@BuckleySandler.com]
**Sent:** Friday, September 17, 2010 2:29 PM
**To:** Rosemary E. Rupert
**Cc:** Robert M. Hart; Douglas Rogers; Jeff Loeser
**Subject:** RE: State ex rel. v. Barclay's Capital Real Estate Inc. (Montgomery Cty. Case)

Thank you for your willingness to be flexible regarding the date for responses to the Ohio Attorney General's First Set of Discovery Requests. HomEq is working diligently to collect documents in response to the State's requests and to prepare responses to its interrogatories. As you are aware, HomEq was recently purchased by Ocwen pursuant to an asset purchase agreement and is undergoing a transition period. In light of the constraints posed by this transition, HomEq requests your consent to an extension of 30 days from the original response date of September 20, 2010. HomEq anticipates that at that time, it will produce its objections, substantive responses to your interrogatories, and documents responsive to your requests, to be completed on a rolling basis. In particular, with respect to documents, HomEq anticipates that on or before October 20, 2010, it will produce the loan / servicing files associated with the 177 loans identified in Exhibit A to the Attorney General's discovery requests, as well as policies and procedures responsive to many of the requests.

Please kindly let us know whether the State consents to a 30-day extension on HomEq's response date.

**Benjamin B. Klubes**
**BuckleySandler LLP**
1250 24th Street, NW, Suite 700
Washington, DC 20037
Tel: (202) 349-8002
Fax: (202) 349-8080
BKlubes@BuckleySandler.com
www.BuckleySandler.com

---

This message is intended only for the designated recipients. It may contain confidential or proprietary information and may be subject to the attorney-client privilege or other confidentiality protections. If you are not a designated recipient, you may not review, copy or distribute this message. If you received this message in error, please notify the sender by reply e-mail and delete this message. Thank you.

---

**From:** Rosemary E. Rupert [mailto:rosemary.rupert@ohioattorneygeneral.gov]
**Sent:** Tuesday, August 10, 2010 12:04 PM
**To:** Klubes, Benjamin B.
**Cc:** Robert M. Hart; Douglas Rogers; Jeff Loeser
**Subject:** State ex rel. v. Barclay's Capital Real Estate Inc. (Montgomery Cty. Case)

Mr. Klubes,

With AAG Bob Hart retiring at the end of the year I will be taking over as lead counsel on behalf of the State in this case. While reviewing the pleadings I noticed Judge O'Connell's order setting telephone pretrial scheduling conference on August 25, 2010. The order requires counsel to meet at least one week before the scheduling conference to discuss discovery, scheduling dates, and possible settlement. To comply with the court's order I suggest we schedule our conference call on August 18, 2010. We are available to meet with your team via conference call on the 18th. Please advise a convenient time for a conference call. Thank you.

Rosemary E. Rupert
Assistant Attorney General
Consumer Protection Section
Ohio Attorney General
30 E. Broad St., 14th Fl.
Columbus, Ohio 43215
(614)752-5548

Please note my email address has changed and is now rosemary.rupert@ohioattorneygeneral.gov

*** CONFIDENTIALITY NOTICE ***
This e-mail message is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message. If you are the intended recipient, but do not wish to receive communications through this medium, please advise the sender immediately.

9/20/2010



FILED
COURT OF COMMON PLEAS
2009 DEC 16  A 8: 39

**IN THE COURT OF COMMON PLEAS
MONTGOMERY COUNTY, OHIO**

| | | |
|---|---|---|
| STATE OF OHIO, ex rel. | ) | CASE NO.  **'09  10136** |
| RICHARD CORDRAY | ) | |
| ATTORNEY GENERAL OF OHIO | ) | |
| 30 East Broad Street, 17th Floor | ) | JUDGE |
| Columbus, Ohio 43215 | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| v. | ) | **COMPLAINT, REQUEST** |
| | ) | **FOR DECLARATORY** |
| BARCLAYS CAPITAL REAL | ) | **AND INJUNCTIVE** |
| ESTATE, INC. dba HOMEQ SERVICING | ) | **RELIEF, CONSUMER** |
| c/o Statutory Agent | ) | **DAMAGES, CIVIL** |
| CT Corporation System | ) | **PENALTIES AND OTHER** |
| 1300 East 9th Street | ) | **APPROPRIATE RELIEF** |
| Cleveland, OH 44114 | ) | |
| | ) | **JURY DEMAND ENDORSED** |
| DEFENDANT. | ) | **HEREON** |

**JURISDICTION**

1.    Plaintiff, State of Ohio, by and through Counsel, the Ohio Attorney General

Richard Cordray, having reasonable cause to believe Defendant, Barclay's Capital Real

Estate, Inc., dba HomEq Servicing, ("HomEq" or "Defendant") has committed violations

of Ohio's consumer protection laws, brings this action in the public interest and on behalf

of the State of Ohio under the authority vested in him by the Ohio Consumer Sales

Practices Act ("CSPA"), Ohio Revised Code §1345.01 *et seq.*


STATE'S
EXHIBIT
I

2.      Defendant HomEq at all relevant times hereto was a Delaware corporation, with its principal place of business located at: 220 Park Avenue, 4th Floor, New York, NY 10166.

3.      Defendant HomEq at all relevant times hereto was licensed as a second mortgage lender, License SM 501447, by the Ohio Department of Commerce, Division of Financial Institutions.

4.      The actions of Defendant, hereinafter described, have occurred throughout the State of Ohio, including Montgomery County as well as other Ohio counties.

5.      At all relevant times hereto Defendant was a "supplier" as that term is defined in Ohio Revised Code §1345.01(C) as Defendant engaged in the business of effecting consumer transactions by servicing residential mortgage loans held by individuals residing in Montgomery County, as well as other counties in the State of Ohio, for purposes that are primarily personal, family or household within the meaning specified in Ohio Revised Code §1345.01(A) and (D).

6.      Jurisdiction over the subject matter of this action lies with this Court pursuant to Ohio Revised Code §1345.04 of the CSPA.

7.      This Court is the proper venue to hear this case pursuant to Ohio Civ. R. 3(B)(1)-(3), in that some of the transactions complained of herein, and out of which this action arose, occurred in Montgomery County, Ohio.

### STATEMENT OF FACTS

8.      Defendant HomEq's mortgage servicing obligations are set forth in various contracts, commonly referred to as Pooling and Servicing Agreements ("PSA"), between Defendant and the true owner of the underlying mortgage loan notes, typically a trust or

2

pool containing thousands of securitized residential mortgage loans.

9.      Defendant HomEq services subprime, alt-A, and prime mortgage loans in Ohio, most of which are financed purchases or refinanced loans on properties that are owner-occupied with the residential mortgage loans secured by a first mortgage lien.

10.     In connection with the servicing of these residential mortgage loans Defendant HomEq accepts, applies, and distributes mortgage loan payments made by Ohio residents.

11.     Defendant HomEq, among other services, offers several different loss mitigation options to borrowers in default or on the verge of default on their mortgage loans, including repayment plans, loan modifications and forbearance agreements.

12.     For some borrowers in economic distress, Defendant HomEq has the borrower enter into a Loan Modification Agreement that, inter alia, contains provisions that: require the borrower to:

    a.  waive all defenses, claims or offsets with respect to the unpaid principal balance as adjusted by HomEq to reflect any unpaid interest, late charges, fees, costs, and advances for property taxes and/or insurance premiums (the "New Balance");

    b.  release HomEq from any claims, damages or liabilities of any kind which are in any way connected with the origination and/or servicing of the loan and/or the events which resulted in the borrower entering into the Loan Modification Agreement;

    c.  waive any rights under federal or state statute or common law providing that a general release does not extend to claims which are not known to exist at the time

3

of execution. [Sample Loan Modification Agreement, with consumer information redacted, is attached as complaint Exhibit A].

13.    For some borrowers in economic distress, Defendant HomEq has the borrower enter into a Forbearance Agreement that, inter alia, contains provisions that: require the borrower to:

a. agree that HomEq can recommence foreclosure proceedings without providing the borrower any further demand/notice or intent to accelerate if HomEq determines that the borrower is in default of the Forbearance Agreement;

b. agree in advance to pay any additional foreclosure fees for property inspections and/or broker price opinions charged at HomEq's discretion;

c. permit HomEq to advance any pending foreclosure action to prevent its dismissal during the term of the Forbearance Agreement;

d. waive the statute of limitations associated with the acceleration of the loan. [Sample Forbearance Agreement, with consumer information redacted, attached as Complaint Exhibit B].

14.    In connection with the servicing of residential mortgage loans in Ohio, Defendant HomEq maintains a customer service department that Ohio residents are directed to call with questions or concerns about their mortgage loan.

15.    Consumers with residential mortgage loans being serviced by HomEq, who have called the company's customer service department, have complained to the Ohio Attorney General that Defendant's employees or agents are unable to communicate meaningfully with consumers regarding those consumers' accounts, with consumers in some cases being placed on long holds, having their calls transferred multiple times and

4

frequently disconnected, and having Defendant's call center workers persistently fail to return calls or respond to repeated account or default related inquiries.

16.     In connection with the servicing of Ohio residential mortgage loans, Defendant HomEq has provided incompetent, inadequate and inefficient customer service by:

    a. losing documents submitted by borrowers requesting loss mitigation assistance leading to a delay in processing the borrowers' loss mitigation request and resulting in the borrowers having to resubmit documents;

    b. failing to respond, or timely respond, to borrower requests for assistance;

    c. filing foreclosure actions against consumers while those consumers were in active and ongoing loss mitigation negotiations and/or discussions with Defendant;

    d. orally offering and implementing a repayment or forbearance plan without reducing that agreement and all of its terms and conditions to writing and providing a copy to the consumer;

    e. failing to offer, or timely offer, affordable loss mitigation options to borrowers;

    f. requiring borrowers to sign loan modifications with unfair and unconscionable provisions that are unconscionably one-sided in Defendant's favor;

    g. purchasing forced-place insurance to cover homeowners' dwellings when such insurance was not necessary or justified and where such insurance was duplicative of valid insurance that already existed to cover the homeowners' residences.

5

## FIRST CAUSE OF ACTION

### Violations of the Consumer Sales Practices Act

17.     Plaintiff, State of Ohio, ex rel. Richard Cordray, Attorney General incorporates by reference, as if completely rewritten herein, the allegations set forth in paragraphs One through Sixteen (1-16) of this Complaint.

18.     Defendant HomEq has engaged in unfair and deceptive and unconscionable acts and practices in violation of Ohio Revised Code §§1345.02, 1345.03, 1345.031, Ohio Administrative Code 109:4-3-02, and 109:4-3-09 by its inadequate, incompetent, and inefficient handling of complaints, inquiries, disputes, and requests for information and assistance in connection with its servicing of Ohio residential mortgage loans, including but not limited to, losing documents submitted by borrowers requesting loss mitigation assistance; failing to respond, or timely respond, to borrowers' requests for assistance; failing to offer, or timely offer, affordable loss mitigation options to borrowers; placing consumers on long holds, transferring consumers multiple times and frequently disconnecting their calls; filing foreclosure actions against consumers while those consumers were in discussions with Defendant for loss mitigation alternatives; orally offering and imposing a repayment of forbearance plan without reducing that agreement and all of its terms and conditions to writing and providing a copy to the consumer; failing to return calls or respond to repeated borrower inquiries for information and assistance; and failing to communicate meaningfully with consumers.

19.     Defendant HomEq has engaged in unfair and deceptive and unconscionable acts and practices in violation of Ohio Revised Code §1345.02, 1345.03 and 1345.031 in connection with the servicing of loans for residences within the State of Ohio by, inter

6

alia; providing loan modification agreements and forbearance agreements with terms inconsistent with, and more onerous than, the terms agreed to by the borrower and requiring consumers to sign loan modification and forbearance agreements containing unfair and unreasonable releases and waivers of rights; misrepresenting the terms of offered loan modifications and forbearance agreements; and requiring borrowers to sign loan modifications and forbearance agreements that are unconscionably one-sided in Defendant HomEq's favor.

### SECOND CAUSE OF ACTION

#### Unfair and Deceptive Loan Modification and Forbearance Terms

20.    Plaintiff, State of Ohio, ex rel. Richard Cordray, Attorney General incorporates by reference, as if completely rewritten herein, the allegations set forth in paragraphs One through Sixteen (1-16) of this Complaint.

21.    Defendant HomEq has engaged in unfair, deceptive and unconscionable acts and practices in violation of Ohio Revised Code §§1345.02, 1345.03 and 1345.031 in connection with Loan Modification Agreements and Forbearance Agreements entered into with Ohio consumers that contain terms that violate the Ohio Consumer Sales Practices Act. Those terms include without limitation: requiring the borrower to waive all defenses, claims or offsets with respect to the new balance as determined by HomEq; requiring the borrower to release HomEq from any claims, damages or liabilities of any kind which are in any way connected with the origination and/or servicing of the loan and/or the events which resulted in the borrower entering into the Loan Modification Agreement; requiring the borrower to waive any rights under federal or state statute or common law providing that a general release does not extend to claims which are not

7

known to exist at the time of execution; requiring the borrower to agree that HomEq can recommence foreclosure proceedings without providing the borrower any further demand/notice or intent to accelerate if HomEq determines that the borrower is in default of the Forbearance Agreement; requiring the borrower to agree in advance to pay any additional foreclosure fees for property inspections and/or broker price opinions charged at HomEq's discretion; requiring the borrower to waive the statute of limitations associated with the acceleration of the loan; stating the agreement is to be interpreted under California law even though the origination, borrower and the property are located in Ohio and subject to Ohio law; and permitting HomEq to continue to prosecute any pending foreclosure action that may result in a judgment or sale order against the consumer during the term of a Forbearance Agreement.

22.      Defendant HomEq has engaged in unfair, deceptive and unconscionable acts and practices in violation of Ohio Revised Code §§1345.02, 1345.03 and 1345.031 in connection with Loan Modification Agreements and Forbearance Agreements entered into with Ohio consumers that use pre-printed forms that contain a waiver of rights and remedies and that purport to provide for, or permit, a judgment to be taken against a consumer without providing that consumer with notice, service of process, or the opportunity to contest the claim in court, which has previously been declared, in a decision by a court in Ohio, to violate R.C. 1345.01 et seq., and which decision was on file pursuant to R.C. 1345.05(A)(3) in the Attorney General's Public Inspection File prior to the occurrence of the acts and practices described herein.

8

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.      **ISSUE A PERMANENT INJUNCTION** enjoining Defendant HomEq, its agents, servants, representatives, salespeople, employees, successors and assigns and all persons acting in concert or participating with it, directly or indirectly, from engaging in the acts or practices of which Plaintiff complains and from further violating the Consumer Sales Practices Act (CSPA),Ohio Revised Code §1345.01 *et seq*.

B.      **ISSUE A PERMANENT INJUNCTION** enjoining Defendant HomEq from enforcing any provision in any agreement it has with borrowers that the Court determines to violate the law, and further ORDER Defendant HomEq to provide written notice of those unenforceable provisions to all borrowers who have entered into such agreements.

C.      **ISSUE A DECLARATORY JUDGMENT** declaring that each act or practice described in Plaintiffs' Complaint violates the Ohio Consumer Sales Practices Act, Ohio Revised Code §1345.01 *et seq*., in the manner set forth in this Complaint.

D.      **ORDER** Defendant HomEq pursuant to Ohio Revised Code §1345.07(B) to reimburse all consumers damaged by its unfair, deceptive, and unconscionable acts or practices, including non-economic damages.

E.      **ORDER** Defendant HomEq to comply with all HAMP Participating Servicer requirements, including compliance with all pre-foreclosure conditions.

F.      **ORDER** Defendant HomEq to notify all of its subsidiaries, including outsourced call centers, independent contractors, employees and agents of HomEq of the terms and conditions of any court ordered relief in this action.

G.      **ASSESS, FINE, AND IMPOSE** upon Defendant HomEq civil penalties of Twenty Five Thousand Dollars ($25,000.00) per violation of Ohio Revised Code §1345.01 *et seq*. pursuant to Ohio Revised Code §1345.07(D).

H.      **ORDER**, as a means of insuring compliance with this Court's Order and with the consumer protection laws of Ohio, that Defendant HomEq maintain in its possession and control for a period of five (5) years all business records relating to Defendant HomEq's servicing of residential mortgage loans in Ohio, and to permit the Ohio Attorney General or his representative, upon reasonable twenty-four (24) hour notice, to inspect and/or copy any and all such records.

I.      **GRANT** the Ohio Attorney General his costs in bringing this action.

J.      **ORDER** Defendant HomEq to pay all court costs.

K.      **GRANT** such other relief as the Court deems to be just, equitable and appropriate.

<div style="margin-left: 40%;">

Respectfully submitted

**RICHARD CORDRAY**
**Ohio Attorney General**

_Robert M. Hart_

Robert M. Hart (0014854)
Sarah Lynn (0058336)
Mindy Worly (0037395)
Rosemary E. Rupert (0042389)
Assistant Attorneys General
30 East Broad Street, 14th Floor
Columbus, OH 443215
614.466.1305 [Telephone]
614.728.9470 [Facsimile]
Robert.Hart@ohioattorneygeneral.gov
Counsel for Plaintiff

</div>

10

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiff State of Ohio ex rel. Ohio Attorney General

Richard Cordray demands a trial by jury in this action.

Respectfully submitted,

**RICHARD CORDRAY**
**ATTORNEY GENERAL**

*Robert M. Hart*

Robert M. Hart (0014854)
Sarah Lynn (0058336)
Mindy Worly (0037395)
Rosemary E. Rupert (0042389)
Assistant Attorneys General
30 East Broad Street, 14th Floor
Columbus, OH 443215
614.466.1305 [Telephone]
614.728.9470 [Facsimile]
Robert.Hart@ohioattorneygeneral.gov
Counsel for Plaintiff

EXECUTION VERSION

# ASSET PURCHASE AGREEMENT

among

BARCLAYS BANK PLC,

BARCLAYS CAPITAL REAL ESTATE INC.,

OCWEN LOAN SERVICING, LLC,

and

(solely with respect to Sections 5.06, 5.24, 8.03, 8.06 and 9.02)

OCWEN FINANCIAL CORPORATION

Dated as of May 28, 2010



STATE'S
EXHIBIT
J

PENGAD 800-631-6989

NY12532:446999.11A

"Servicer Advance Purchase Price" means (i) the total amount of outstanding Servicer Advance Receivables less (ii) the amount of any Custodial Account Funded Advances.

"Servicer Advance Receivable" means, with respect to any Servicer Advances, the contractual right to reimbursement pursuant to the terms of the applicable Servicing Agreement for such Servicer Advances made by a Seller in its capacity as Servicer pursuant to such Servicing Agreement, which Servicer Advances have not previously been reimbursed, and including all rights of the Servicer to enforce payment of such obligation under the related Servicing Agreement. A "Servicer Advance Receivable" shall remain a "Servicer Advance Receivable," and shall not be deemed to have been converted into cash unless and except to the extent that cash has been deposited into the collection account established pursuant to the Servicing Advance Financing Agreements (in the case of Securitization Servicing Agreements) or the Secured Loan Facility Agreements (in the case of the Whole Loan Contracts) for reimbursement of that Servicer Advance Receivable.

"Servicer Litigation" means any and all actions, lawsuits, affirmative claims in bankruptcy, counterclaims and similar Litigation pending in federal or state courts or before administrative agencies that either Seller as Servicer is prosecuting, defending or otherwise managing (or is responsible for prosecuting, defending or otherwise managing) on behalf of the applicable trust or Investors pursuant to the terms of the applicable Servicing Agreement.

"Servicing" means mortgage loan servicing, subservicing and special servicing rights and obligations, including one or more of the following functions (or a portion thereof): (a) the administration and collection of payments for the reduction of principal and/or the application of interest on a Mortgage Loan; (b) the collection of payments on account of Taxes and insurance; (c) the remittance of appropriate portions of collected payments; (d) the provision of escrow administration; (e) the pursuit of foreclosure and alternative remedies against a related Mortgaged Property; and (f) the administration and liquidation of REO Properties, and, in each case, all rights, powers and privileges incidental to any of the foregoing, and expressly includes the right to enter into arrangements with third parties that generate Ancillary Income and benefits with respect to the Mortgage Loans.

"Servicing Advance Financing Agreements" means (1) the Indenture (the "Indenture") to be executed at the Closing among Ocwen Financial Corporation (as Administrator), the Purchaser (as Servicer), Deutsche Bank National Trust Company (or another trustee reasonably acceptable to the Sellers), HomEq Servicer Advance Receivables Trust 2010-ADV1 (as Issuer), and the Parent (as Administrative Agent), (2) the Advance Receivables Backed Notes to be issued under the Indenture, (3) the Receivables Sale Agreement (as defined in the Indenture), (4) the Receivables Pooling Agreement (as defined in the Indenture); in each case of clauses (1)-(4), substantially in the forms attached to the Commitment Letter, with such (X) changes as may be required by Standard & Poor's to achieve ratings of (i) "AAA" on the Class A-1 Notes and the Class A-2 Notes, with the advance rates for such "AAA" rated classes being at least 65%, (ii) "AA" on the Class B Notes, (iii) "A" on the Class C Notes, and (iv) "BBB" on the Class D Notes, if the Sellers desire to obtain such ratings or (Y) changes to delete provisions for ratings if the Sellers decide not to obtain ratings on such notes; provided, however, that with respect to the changes described under clause (X), the Purchaser shall not be required to agree to any such required changes if such required changes, after taking into account (A) all such other required

IN WITNESS WHEREOF, the Sellers, the Purchaser and the Purchaser Parent have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

BARCLAYS BANK PLC

By: _____
    Name:
    Title:

BARCLAYS CAPITAL REAL ESTATE INC.

By: _____
    Name:
    Title:

OCWEN LOAN SERVICING, LLC

By: _____
    Name:
    Title:

*[Signatures continue on the next page ]*

*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the Sellers, the Purchaser and the Purchaser Parent have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

BARCLAYS BANK PLC

By: _____
    Name:
    Title:

BARCLAYS CAPITAL REAL ESTATE INC.

By: _____
    Name:
    Title:

OCWEN LOAN SERVICING, LLC

By: _____
    Name:  Ronald M. Faris
    Title:  President

*[Signatures continue on the next page ]*

*[Signature Page to Asset Purchase Agreement]*

OCWEN FINANCIAL CORPORATION

By: _____

Name: Ronald M. Faris

Title: President

(solely with respect to Sections 5 06, 5 24, 8 03, 8 06 and 9.02)

[*Signature Page to Asset Purchase Agreement*]

IN WITNESS WHEREOF, the Sellers, the Purchaser and the Purchaser Parent have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

BARCLAYS BANK PLC

By: _____

Name: JAMES     TREVELYAN

Title: DIRECTOR, SENIOR   LEAD,
        BARCLAYS  CORPORATE  DEVELOPMENT

BARCLAYS CAPITAL REAL ESTATE INC.

By: _____

Name:

Title:

OCWEN LOAN SERVICING, LLC

By: _____

Name:

Title:

*[Signatures continue on the next page ]*

*[Signature Page to Asset Purchase Agreement]*

Sponsored Ads...

REO Short Sale Homes
Bid Online & Get An Exclusive List Of FL and CA Short Sale Listings!
www.preo.us.com

Ads by Google

EXHIBIT 4

SECURITIZED ASSET BACKED RECEIVABLES LLC,
Depositor,

HOMEQ SERVICING CORPORATION,
Servicer,

WMC MORTGAGE CORP.,
Responsible Party

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,
Trustee

--------------------------------------------------------------
POOLING AND SERVICING AGREEMENT

Dated as of October 1, 2006
--------------------------------------------------------------

SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-WM2

MORTGAGE PASS-THROUGH CERTIFICATES,
SERIES 2006-WM2

.


STATE'S
EXHIBIT
H
PENGAD 800-631-6989

(i) conflicts or will conflict with or results or will result in a breach of, or constitutes or will constitute a default or results or will result in an acceleration under (A) the certificate of formation or limited liability company agreement of the Depositor, or (B) of any term, condition or provision of any material indenture, deed of trust, contract or other agreement or instrument to which the Depositor or any of its subsidiaries is a party or by which it or any of its subsidiaries is bound; (ii) results or will result in a violation of any law, rule, regulation, order, judgment or decree applicable to the Depositor of any court or governmental authority having jurisdiction over the Depositor or its subsidiaries; or (iii) results in the creation or imposition of any lien, charge or encumbrance which would have a material adverse effect upon the Mortgage Loans or any documents or instruments evidencing or securing the Mortgage Loans;

(f) There are no actions, suits or proceedings before or against or investigations of, the Depositor pending, or to the knowledge of the Depositor, threatened, before any court, administrative agency or other tribunal, and no notice of any such action, which, in the Depositor's reasonable judgment, might materially and adversely affect the performance by the Depositor of its obligations under this Agreement, or the validity or enforceability of this Agreement;

(g) The Depositor is not in default with respect to any order or decree of any court or any order, regulation or demand of any federal, state, municipal or governmental agency that would materially and adversely affect its performance hereunder; and

(h) Immediately prior to the transfer and assignment by the Depositor to the Trustee on the Closing Date, the Depositor had good title to, and was the sole owner of each Mortgage Loan, free of any interest of any other Person, and the Depositor has transferred all right, title and interest in each Mortgage Loan to the Trustee. The transfer of the Mortgage Note and the Mortgage as and in the manner contemplated by this Agreement is sufficient either (i) fully to transfer to the Trustee, for the benefit of the Certificateholders, all right, title, and interest of the Depositor thereto as note holder and mortgagee or (ii) to grant to the Trustee, for the benefit of the Certificateholders, the security interest referred to in Section 10.04.

It is understood and agreed that the representations, warranties and covenants set forth in this Section 2.07 shall survive delivery of the respective Custodial Files to the Trustee and shall inure to the benefit of the Trustee.

### ARTICLE III

### ADMINISTRATION AND SERVICING
### OF MORTGAGE LOANS

**Section 3.01 Servicer to Service Mortgage Loans.** (a) For and on behalf of the Certificateholders, the Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and the respective Mortgage Loans and, to the extent consistent with such terms, in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers administering similar mortgage loans but without regard to:

(i) any relationship that the Servicer, any Subservicer or any Affiliate of the Servicer or any Subservicer may have with the related Mortgagor;

(ii) the ownership or non-ownership of any Certificate by the Servicer or any Affiliate of the Servicer;

(iii) the Servicer's obligation to make P&I Advances or Servicing Advances; or

(iv) the Servicer's or any Subservicer's right to receive compensation for its services hereunder or with respect to any particular transaction.

To the extent consistent with the foregoing, if the Servicer shall seek to maximize the timely and complete recovery of principal and interest on the Mortgage Notes. Subject only to the above-described servicing standards and the terms of this Agreement and of the respective Mortgage Loans, the Servicer shall have full power and authority, acting alone or through Subservicers as provided in Section 3.02, to do or cause to be done any and all things in connection with such servicing and administration which it may deem necessary or desirable. Without limiting the generality of the foregoing, the Servicer in its own name or in the name of a Subservicer is hereby authorized and empowered by the Trustee when the Servicer believes it appropriate in its best judgment in accordance with Accepted Servicing Practices, to execute and deliver any and all instruments of satisfaction or cancellation, or of partial or full release or discharge, and all other comparable instruments, with respect to the Mortgage Loans and the Mortgaged Properties and to institute foreclosure proceedings or obtain a deed-in-lieu of foreclosure so as to convert the ownership of such properties, and to hold or cause to be held title to such properties, on behalf of the Trustee. The Servicer shall be responsible for preparing and recording all lien releases and mortgage satisfactions in accordance with state and local regulations, and shall be responsible for all expenses in connection therewith if not paid by the Mortgagor if permitted by applicable law and the related Mortgage Loan Documents (except if such expense would constitute a Servicing Advance) and all other consequences resulting from its failure to fully discharge such obligation. The Servicer shall service and administer the Mortgage Loans in accordance with applicable state and federal law and shall provide to the Mortgagors any reports required to be provided to them thereby. The Servicer shall also comply in the performance of this Agreement with all

reasonable rules and requirements of each insurer under any standard hazard insurance policy. Subject to Section 3.16, the Trustee shall execute, at the written request of the Servicer, and furnish to the Servicer and any Subservicer such documents provided to the Trustee as are necessary or appropriate to enable the Servicer or any Subservicer to carry out their servicing and administrative duties hereunder, and the Trustee hereby grants to the Servicer, and this Agreement shall constitute, a power of attorney to carry out such duties including a power of attorney to take title to Mortgaged Properties after foreclosure on behalf of the Trustee. The Trustee shall execute a separate power of attorney, furnished to it by the Servicer, in favor of the Servicer for the purposes described herein to the extent necessary or desirable to enable the Servicer to perform its duties hereunder. The Trustee shall not be liable for the actions of the Servicer or any Subservicers under such powers of attorney.

(b) Subject to Section 3.09(b), in accordance with the standards of the preceding paragraph, the Servicer shall advance or cause to be advanced funds as necessary for the purpose of effecting the timely payment of taxes and assessments on the Mortgaged Properties, which advances shall be Servicing Advances reimbursable in the first instance from related collections from the Mortgagors pursuant to Section 3.09(b), and further as provided in Section 3.11. Any cost incurred by the Servicer or by Subservicers in effecting the timely payment of taxes and assessments on a Mortgaged Property shall not be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit.

(c) Notwithstanding anything in this Agreement to the contrary, the Servicer may not make any future advances with respect to a Mortgage Loan (except as provided in Section 4.01 and except for Servicing Advances) and the Servicer shall not (i) permit any modification with respect to any Mortgage Loan that would change the Mortgage Rate, reduce or increase the principal balance (except for reductions resulting from actual payments of principal) or change the final maturity date on such Mortgage Loan (except for a reduction of interest payments resulting from the application of the Servicemembers Civil Relief Act or any similar state statutes) or (ii) permit any modification, waiver or amendment of any term of any Mortgage Loan that would both (A) effect an exchange or reissuance of such Mortgage Loan under Section 1001 of the Code (or final, temporary or proposed Treasury regulations promulgated thereunder) and (B) cause any Trust REMIC to fail to qualify as a REMIC under the Code or the imposition of any tax on "prohibited transactions" or "contributions after the startup day" under the REMIC Provisions, or (iii) except as provided in Section 3.07(a), waive any Prepayment Charges.

(d) The Servicer may delegate its responsibilities under this Agreement; provided, however, that no such delegation shall release the Servicer from the responsibilities or liabilities arising under this Agreement.

**Section 3.02 Subservicing Agreements between the Servicer and Subservicers.** (a) The Servicer may enter into subservicing agreements with Subservicers for the servicing and administration of the Mortgage Loans ("_Subservicing Agreements_"). The Servicer represents and warrants to the other parties hereto that no Subservicing Agreement is in effect as of the Closing Date with respect to any Mortgage Loans required to be serviced by it hereunder. The Servicer shall give notice to the Depositor and the Trustee of any such Subservicer and Subservicing Agreement, which notice shall contain all information (including without limitation a copy of the Subservicing Agreement) reasonably necessary to enable the Trustee, pursuant to Section 8.12(g), to accurately and timely report the event under Item 6.02 of Form 8-K pursuant to the Exchange Act (if such reports under the Exchange Act are required to be filed under the Exchange Act). No Subservicing Agreement shall be effective until 30 days after such written notice is received by both the Depositor and the Trustee. The Trustee shall not be required to review or consent to such Subservicing Agreements and shall have no liability in connection therewith.

(b) Each Subservicer shall be (i) authorized to transact business in the state or states in which the related Mortgaged Properties it is to service are situated, if and to the extent required by applicable law to enable the Subservicer to perform its obligations hereunder and under the Subservicing Agreement, (ii) an institution approved as a mortgage loan originator by the Federal Housing Administration or an institution that has deposit accounts insured by the FDIC and (iii) a Freddie Mac or Fannie Mae approved mortgage servicer. Each Subservicing Agreement must impose on the Subservicer requirements conforming to the provisions set forth in Section 3.08 and provide for servicing of the Mortgage Loans consistent with the terms of this Agreement. The Servicer will examine each Subservicing Agreement and will be familiar with the terms thereof. The terms of any Subservicing Agreement will not be inconsistent with any of the provisions of this Agreement. The Servicer and the Subservicers may enter into and make amendments to the Subservicing Agreements or enter into different forms of Subservicing Agreements; provided, however, that any such amendments or different forms shall be consistent with and not violate the provisions of this Agreement, and that no such amendment or different form shall be made or entered into which could be reasonably expected to be materially adverse to the interests of the Trustee, without the consent of the Trustee. Any variation without the consent of the Trustee from the provisions set forth in Section 3.08 relating to insurance or priority requirements of Subservicing Accounts, or credits and charges to the Subservicing Accounts or the timing and amount of remittances by the Subservicers to the Servicer, are conclusively deemed to be inconsistent with this Agreement and therefore prohibited. The Servicer shall deliver to the Trustee and the Depositor copies of all Subservicing Agreements, and any amendments or modifications thereof, promptly upon the Servicer's execution and delivery of such instruments.

(c) As part of its servicing activities hereunder, the Servicer (except as otherwise provided in the last sentence of this paragraph), for the benefit of the Trustee, shall enforce the obligations of each Subservicer under the related Subservicing Agreement, including, without limitation, any obligation to make advances in respect of delinquent payments as required by a

Subservicing Agreement. Such enforcement, including, without limitation, the legal prosecution of claims, termination of Subservicing Agreements, and the pursuit of other appropriate remedies, shall be in such form and carried out to such an extent and at such time as the Servicer, in its good faith business judgment, would require were it the owner of the related Mortgage Loans. The Servicer shall pay the costs of such enforcement at its own expense, and shall be reimbursed therefor only (i) from a general recovery resulting from such enforcement, to the extent, if any, that such recovery exceeds all amounts due in respect of the related Mortgage Loans or (ii) from a specific recovery of costs, expenses or attorneys' fees against the party against whom such enforcement is directed.

(d) The Servicer shall cause any Subservicer engaged by the Servicer (or by any Subservicer) for the benefit of the Depositor and the Trustee to comply with the provisions of this Section 3.02 and with Sections 3.22, 3.23, 6.02 and 6.05 of this Agreement to the same extent as if such Subservicer were the Servicer, and to provide the information required with respect to such Subservicer under Section 8.12 of this Agreement. The Servicer shall be responsible for obtaining from each such Subservicer and delivering to applicable Persons any servicer compliance statement required to be delivered by such Subservicer under Section 3.22 and any assessment of compliance report and related accountant's attestation required to be delivered by such Subservicer under Section 3.23, in each case as and when required to be delivered.

(e) Subject to the conditions set forth in this Section 3.02(e), the Servicer and any Subservicer engaged by the Servicer is permitted to utilize one or more Subcontractors to perform certain of its obligations hereunder. The Servicer shall promptly upon request provide to the Depositor and the Trustee a written description (in form and substance satisfactory to the Depositor and the Trustee) of the role and function of each Subcontractor utilized by the Servicer or any such Subservicer, specifying, not later than the date specified for delivery of the annual report on assessment of compliance set forth in Section 3.23(a) (i) the identity of each such Subcontractor, if any, that is "*participating in the servicing function*" within the meaning of Item 1122 of Regulation AB, and (ii) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Subcontractor identified pursuant to clause (i) of this paragraph. As a condition to the utilization by the Servicer or any such Subservicer of any Subcontractor determined to be "*participating in the servicing function*" within the meaning of Item 1122 of Regulation AB, the Servicer shall cause any such Subcontractor used by the Servicer (or by any such Subservicer) for the benefit of the Depositor and the Trustee to comply with the provisions of Section 3.23 of this Agreement to the same extent as if such Subcontractor were the Servicer. The Servicer shall be responsible for obtaining from each such Subcontractor and delivering to the applicable Persons any assessment of compliance report and related accountant's attestation required to be delivered by such Subcontractor under Section 3.23, in each case as and when required to be delivered.

Notwithstanding the foregoing, the Servicer engages a Subcontractor in connection with the performance of any of its duties under this Agreement, the Servicer shall be responsible for determining whether such Subcontractor is a "*servicer*" within the meaning of Item 1101 of Regulation AB and whether any such affiliate or third-party vendor meets the criteria in Item 1108(a)(2)(i) through (iii) of Regulation AB. If the Servicer determines, pursuant to the preceding sentence, that such Subcontractor is a "*servicer*" within the meaning of Item 1101 of Regulation AB and meets the criteria in Item 1108(a)(2)(i) through (iii) of Regulation AB, then such Subcontractor shall be deemed to be a Subservicer for purposes of this Agreement, the engagement of such Subservicer shall not be effective unless and until notice is given pursuant to Section 3.02(a) and the Servicer shall comply with Section 3.02(d) with respect thereto.

**Section 3.03 Successor Subservicers.** The Servicer shall be entitled to terminate any Subservicing Agreement and the rights and obligations of any Subservicer pursuant to any Subservicing Agreement in accordance with the terms and conditions of such Subservicing Agreement; provided, however, that the termination, resignation or removal of a Subservicer shall not be effective until 30 days after written notice is received by both the Depositor and the Trustee that contains all information reasonably necessary to enable the Trustee, pursuant to Section 8.12(g), to accurately and timely report the event under Item 6.02 of Form 8-K pursuant to the Exchange Act (if such reports under the Exchange Act are required to be filed under the Exchange Act). In the event of termination of any Subservicer, all servicing obligations of such Subservicer shall be assumed simultaneously by the Servicer without any act or deed on the part of such Subservicer or the Servicer, and the Servicer either shall service directly the related Mortgage Loans or shall enter into a Subservicing Agreement with a successor Subservicer which qualifies under Section 3.02.

Any Subservicing Agreement shall include the provision that such agreement may be immediately terminated by the Depositor or the Trustee without fee, in accordance with the terms of this Agreement, in the event that the Servicer shall, for any reason, no longer be the Servicer (including termination due to an Event of Default).

**Section 3.04 Liability of the Servicer.** Notwithstanding any Subservicing Agreement, any of the provisions of this Agreement relating to agreements or arrangements between the Servicer and a Subservicer or reference to actions taken through a Subservicer or otherwise, the Servicer shall remain obligated and primarily liable to the Trustee for the servicing and administering of the Mortgage Loans in accordance with the provisions of Section 3.01 without diminution of such obligation or liability by virtue of such Subservicing Agreements or arrangements or by virtue of indemnification from the Subservicer and to the same extent and under the same terms and conditions as if the Servicer alone were servicing and administering the Mortgage Loans. The Servicer shall be entitled to enter into any agreement with a Subservicer for indemnification of the Servicer by such Subservicer and nothing contained in this Agreement shall be deemed to limit or modify such indemnification.

Section 3.05 No Contractual Relationship between Subservicers and the Trustee. Any Subservicing Agreement that may be entered into and any transactions or services relating to the Mortgage Loans involving a Subservicer in its capacity as such shall be deemed to be between the Subservicer and the Servicer alone, and the Trustee (or any successor Servicer) shall not be deemed a party thereto and shall have no claims, rights, obligations, duties or liabilities with respect to the Subservicer except as set forth in Section 3.06. The Servicer shall be solely liable for all fees owed by it to any Subservicer, irrespective of whether the Servicer's compensation pursuant to this Agreement is sufficient to pay such fees.

Section 3.06 Assumption or Termination of Subservicing Agreements by Trustee. In the event the Servicer at any time shall for any reason no longer be the Servicer (including by reason of the occurrence of an Event of Default), the Trustee, or its designee or the successor Servicer if the successor is not the Trustee, shall thereupon assume all of the rights and obligations of the Servicer under each Subservicing Agreement that the Servicer may have entered into, with copies thereof provided to the Trustee or the successor Servicer if the successor is not the Trustee, prior to the Trustee or the successor Servicer if the successor is not the Trustee, assuming such rights and obligations, unless the Trustee elects to terminate any Subservicing Agreement in accordance with its terms as provided in Section 3.03.

Upon such assumption, the Trustee, its designee or the successor servicer shall be deemed, subject to Section 3.03, to have assumed all of the Servicer's interest therein and to have replaced the Servicer as a party to each Subservicing Agreement to the same extent as if each Subservicing Agreement had been assigned to the assuming party, except that (i) the Servicer shall not thereby be relieved of any liability or obligations under any Subservicing Agreement that arose before it ceased to be the Servicer and (ii) none of the Depositor, the Trustee, their designees or any successor Servicer shall be deemed to have assumed any liability or obligation of the Servicer that arose before it ceased to be the Servicer.

The Servicer at its expense shall, upon request of the Trustee, its designee or the successor Servicer deliver to the assuming party all documents and records relating to each Subservicing Agreement and the Mortgage Loans then being serviced and an accounting of amounts collected and held by or on behalf of it, and otherwise use its best efforts to effect the orderly and efficient transfer of the Subservicing Agreements to the assuming party.

Section 3.07 Collection of Certain Mortgage Loan Payments. (a) The Servicer shall make reasonable efforts to collect all payments called for under the terms and provisions of the Mortgage Loans, and shall, to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any applicable Insurance Policies, follow such collection procedures as it would follow with respect to mortgage loans comparable to the Mortgage Loans and held for its own account. Consistent with the foregoing and Accepted Servicing Practices, the Servicer may (i) waive any late payment charge or, if applicable, any penalty interest, or (ii) extend the Due Dates for the Scheduled Payments due on a Mortgage Note for a period of not greater than 180 days; provided, that any extension pursuant to clause (ii) above shall not affect the amortization schedule of any Mortgage Loan for purposes of any computation hereunder, except as provided below. In the event of any such arrangement pursuant to clause (ii) above, the Servicer shall make timely advances on such Mortgage Loan during such extension pursuant to Section 4.01 and in accordance with the amortization schedule of such Mortgage Loan without modification thereof by reason of such arrangements, subject to Section 4.01(d) pursuant to which the Servicer shall not be required to make any such advances that are Nonrecoverable P&I Advances. Notwithstanding the foregoing, the Servicer may waive, in whole or in part, a Prepayment Charge only under the following circumstances: (i) such waiver relates to a default or a reasonably foreseeable default and would, in the reasonable judgment of the Servicer, maximize recovery of total proceeds taking into account the value of such Prepayment Charge and the related Mortgage Loan or (ii) such Prepayment Charge is not permitted to be collected by applicable law. If a Prepayment Charge is waived other than as permitted by the prior sentence, then the Servicer is required to pay the amount of such waived Prepayment Charge, for the benefit of the Holders of the Class P Certificates, by depositing such amount into the Collection Account from its own funds, without any right of reimbursement therefor, together with and at the time that the amount prepaid on the related Mortgage Loan is required to be deposited into the Collection Account; provided, however, that the Servicer shall not have an obligation to pay the amount of any uncollected Prepayment Charge if the failure to collect such amount is the direct result of inaccurate or incomplete information on the Mortgage Loan Schedule in effect at such time.

(b) (i) The Trustee shall establish and maintain the Excess Reserve Fund Account, on behalf of the Class X Certificateholders, to receive any Basis Risk Payment and to secure their limited recourse obligation to pay to the LIBOR Certificateholders Basis Risk Carry Forward Amounts (prior to using any Interest Rate Cap Payments or Net Swap Receipts). For the avoidance of doubt, any Basis Risk Carry Forward Amounts shall be paid to the LIBOR Certificates first from the Excess Reserve Fund Account and then from the Supplemental Interest Account.

(ii) On each Distribution Date, the Trustee shall deposit the amount of any Basis Risk Payment for such date into the Excess Reserve Fund Account.

(c) (i) On each Distribution Date on which there exists a Basis Risk Carry Forward Amount on any Class of Certificates, the Trustee shall (1) withdraw from the Distribution Account and deposit in the Excess Reserve Fund Account, as set forth in Section 4.02(a)(iii)(S), the lesser of (x) the Class X Distributable Amount (without regard to the reduction in the definition thereof for any Basis Risk Carry Forward Amount or any Defaulted Swap Termination Payment (to the extent remaining after the distributions specified in Sections 4.02(a)(iii)(A)-(R)) and (y) the aggregate Basis Risk Carry Forward Amounts for such Distribution Date and (2) withdraw from the Excess Reserve Fund Account

amounts necessary to pay to such Class or Classes of Certificates the Basis Risk Carry Forward Amount. Such payments shall be allocated to those Classes and paid in the priority set forth in Sections 4.02(a)(iii)(T).

(ii) The Trustee shall account for the Excess Reserve Fund Account as an asset of a grantor trust under subpart E, Part I of subchapter J of the Code and not as an asset of any REMIC created pursuant to this Agreement. The beneficial owners of the Excess Reserve Fund Account are the Class X Certificateholders. For all federal tax purposes, amounts transferred by the Upper Tier REMIC to the Excess Reserve Fund Account shall be treated as distributions by the Trustee to the Class X Certificateholders.

(iii) Any Basis Risk Carry Forward Amounts paid by the Trustee to the LIBOR Certificateholders from the Excess Reserve Fund Account or the Supplemental Interest Account shall be accounted for by the Trustee as amounts paid first to the Holders of the Class X Certificates (in respect of the Class X Interest or the Class IO Interest, respectively) and then to the respective Class or Classes of LIBOR Certificates. In addition, the Trustee shall account for the LIBOR Certificateholders' rights to receive payments of Basis Risk Carry Forward Amounts from the Excess Reserve Fund Account (along with payments of Basis Risk Carry Forward Amounts and, without duplication, Upper Tier Carry Forward Amounts from the Supplemental Interest Account) as rights in a limited recourse interest rate cap contract written by the Class X Certificateholders in favor of the LIBOR Certificateholders.

(iv) Notwithstanding any provision contained in this Agreement, the Trustee shall not be required to make any payments from the Excess Reserve Fund Account except as expressly set forth in this Section 3.07(c) and Sections 4.02(a)(iii)(T).

(d) The Trustee shall establish and maintain the Distribution Account on behalf of the Certificateholders. The Depositor shall cause to be deposited into the Distribution Account on the Closing Date the Closing Date Deposit Amount. The Trustee shall, promptly upon receipt, deposit in the Distribution Account and retain therein the following:

(i) the aggregate amount remitted by the Servicer to the Trustee pursuant to Section 3.11;

(ii) any amount deposited by the Servicer pursuant to Section 3.12(b) in connection with any losses on Permitted Investments; and

(iii) any other amounts deposited hereunder which are required to be deposited in the Distribution Account.

In the event that the Servicer shall remit any amount not required to be remitted, it may at any time direct the Trustee in writing to withdraw such amount from the Distribution Account, any provision herein to the contrary notwithstanding. Such direction may be accomplished by delivering notice to the Trustee which describes the amounts deposited in error in the Distribution Account. All funds deposited in the Distribution Account shall be held by the Trustee in trust for the Certificateholders until disbursed in accordance with this Agreement and withdrawn in accordance with Section 4.02. In no event shall the Trustee incur liability for withdrawals from the Distribution Account at the direction of the Servicer.

(e) The Trustee may invest the funds in the Distribution Account in one or more Permitted Investments in accordance with Section 3.12. The Trustee may withdraw from the Distribution Account any income or gain earned from the investment of funds deposited therein for its own benefit.

(f) The Servicer shall give notice to the Trustee, each Rating Agency and the Depositor of any proposed change of the location of the Collection Account within a reasonable period of time prior to any change thereof.

(g) In order to comply with its duties under the USA Patriot Act of 2001, the Trustee shall comply with any Wells Fargo anti-money laundering policies, including, without limitation, any customer identification procedures.

**Section 3.08 Subservicing Accounts.** In those cases where a Subservicer is servicing a Mortgage Loan pursuant to a Subservicing Agreement, the Subservicer will be required to establish and maintain one or more segregated accounts (collectively, the "*Subservicing Account*"). The Subservicing Account shall be an Eligible Account and shall otherwise be acceptable to the Servicer. The Subservicer shall deposit in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Subservicer's receipt thereof, all proceeds of Mortgage Loans received by the Subservicer less its servicing compensation to the extent permitted by the Subservicing Agreement, and shall thereafter deposit such amounts in the Subservicing Account, in no event more than two Business Days after the deposit of such funds into the clearing account. The Subservicer shall thereafter deposit such proceeds in the Collection Account or remit such proceeds to the Servicer for deposit in the Collection Account not later than two Business Days after the deposit of such amounts in the Subservicing Account. For purposes of this Agreement, the Servicer shall be deemed to have received payments on the Mortgage Loans when the Subservicer receives such payments.

**Section 3.09 Collection of Taxes, Assessments and Similar Items; Escrow Accounts.** (a) The Servicer shall ensure that each of the Mortgage Loans shall be covered by a paid-in-full, life-of-the-loan tax service contract in effect with respect to each First Lien Mortgage Loan (each, a "*Tax Service Contract*"). Each Tax Service Contract shall be assigned to the Trustee, or its

designee, at the Servicer's expense in the event that the Servicer is terminated as Servicer of the related Mortgage Loan.

(b) To the extent that the services described in this paragraph (b) are not otherwise provided pursuant to the Tax Service Contracts described in paragraph (a) above, the Servicer undertakes to perform such functions. To the extent the related Mortgage provides for Escrow Payments, the Servicer shall establish and maintain, or cause to be established and maintained, one or more segregated accounts (the "Escrow Accounts"), which shall be Eligible Accounts. The Servicer shall deposit in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Servicer's receipt thereof, all (i) collections from the Mortgagors (or related advances from Subservicers) for the payment of taxes, assessments, hazard insurance premiums and comparable items for the account of the Mortgagors ("Escrow Payments") collected on account of the Mortgage Loans and (ii) all Condemnation Proceeds and Insurance Proceeds to be applied to the restoration of the related Mortgaged Property or released to the related Mortgagor in accordance with applicable law and Accepted Servicing Practices, and the Servicer shall thereafter deposit such Escrow Payments in the Escrow Accounts, in no event more than two Business Days after the deposit of such funds in the clearing account, for the purpose of effecting the payment of any such items as required under the terms of this Agreement. Withdrawals of amounts from an Escrow Account may be made only to (i) effect payment of taxes, assessments, hazard insurance premiums, and comparable items; (ii) reimburse the Servicer (or a Subservicer to the extent provided in the related Subservicing Agreement) out of related collections for any advances made pursuant to Section 3.01 (with respect to taxes and assessments) and Section 3.13 (with respect to hazard insurance); (iii) refund to Mortgagors any sums as may be determined to be overages; (iv) pay itself any interest earned on the Escrow Account or, if required and as described below, to Mortgagors on balances in the Escrow Account; (v) clear and terminate the Escrow Account at the termination of the Servicer's obligations and responsibilities in respect of the Mortgage Loans under this Agreement; (vi) transfer such funds to a replacement Escrow Account that meets the requirements hereof; (vii) recover amounts deposited in error or (viii) to release Condemnation Proceeds or Insurance Proceeds to be applied to the restoration of the related Mortgaged Property or to the related Mortgagor in accordance with the applicable law and Accepted Servicing Practices. As part of its servicing duties, the Servicer or Subservicers shall pay to the Mortgagors interest on funds in Escrow Accounts, to the extent required by law and, to the extent that interest earned on funds in the Escrow Accounts is insufficient, to pay such interest from its or their own funds, without any reimbursement therefor. To the extent that a Mortgage does not provide for Escrow Payments, the Servicer shall use its reasonable best efforts to determine whether any such payments are made by the Mortgagor in a manner and at a time that avoids the loss of the Mortgaged Property due to a tax sale or the foreclosure of a tax lien. The Servicer assumes full responsibility for the payment of all such bills within such time and shall effect payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of same or the making of the Escrow Payments and shall make advances from its own funds to effect such payments, including any payment required to be made in connection with a Mortgage Loan that does provide for Escrow Payments and is insufficient to make such payments; provided, however, that such advances are deemed to be Servicing Advances.

Section 3.10 Collection Account. (a) On behalf of the Trustee and the Certificateholders, the Servicer shall establish and maintain, or cause to be established and maintained, one or more segregated Eligible Accounts (such account or accounts, the "Collection Account"), held in trust for the benefit of the Trustee on behalf of the Certificateholders. On behalf of the Trustee, the Servicer shall deposit or cause to be deposited in the clearing account (which account must be an Eligible Account) in which it customarily deposits payments and collections on mortgage loans in connection with its mortgage loan servicing activities on a daily basis, and in no event more than one Business Day after the Servicer's receipt thereof, and shall thereafter deposit into the Collection Account, in no event more than two Business Days after the deposit of such funds into the clearing account, as and when received or as otherwise required hereunder, the following payments and collections received or made by it subsequent to the Cut-off Date (other than in respect of principal or interest on the related Mortgage Loans due on or before the Cut-off Date), or payments (other than Principal Prepayments) received by it on or prior to the Cut-off Date but allocable to a Due Period subsequent thereto:

(i) all payments on account of principal, including Principal Prepayments, on the Mortgage Loans;

(ii) all payments on account of interest (net of the related Servicing Fee) on each Mortgage Loan;

(iii) all Insurance Proceeds and Condemnation Proceeds to the extent such Insurance Proceeds and Condemnation Proceeds are not to be applied to the restoration of the related Mortgaged Property or released to the related Mortgagor in accordance with the express requirements of law or in accordance with Accepted Servicing Practices, Liquidation Proceeds and Subsequent Recoveries;

(iv) any amounts required to be deposited pursuant to Section 3.12 in connection with any losses realized on Permitted Investments with respect to funds held in the Collection Account;

(v) any amounts required to be deposited by the Servicer pursuant to the second paragraph of Section 3.13(a) in respect of any blanket policy deductibles;

(vi) all proceeds of any Mortgage Loan repurchased or purchased in accordance with this Agreement or the Sponsor Representation Letter; and

(vii) all Prepayment Charges collected by the Servicer or required to be paid by the Servicer pursuant to Section 3.07.

The foregoing requirements for deposit in the Collection Account shall be exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges, NSF fees, reconveyance fees, assumption fees and other similar fees and charges need not be deposited by the Servicer in the Collection Account and shall, upon collection, belong to the Servicer as additional compensation for its servicing activities. In the event the Servicer shall deposit in the Collection Account any amount not required to be deposited therein, it may at any time withdraw such amount from the Collection Account, any provision herein to the contrary notwithstanding. The Servicer shall at its own expense be responsible for reviewing and reconciling the Collection Account in accordance with industry standards and shall act promptly to resolve any discrepancies related thereto.

(b) Funds in the Collection Account may be invested in Permitted Investments in accordance with the provisions set forth in Section 3.12, subject to Section 3.21(c). The Servicer shall give notice to the Trustee and the Depositor of the location of the Collection Account maintained by it when established and prior to any change thereof.

**Section 3.11 Withdrawals from the Collection Account.** (a) The Servicer shall, from time to time, make withdrawals from the Collection Account for any of the following purposes or as described in Section 4.01:

(i) on or prior to each Remittance Date, to remit to the Trustee (A) the Trustee Fee with respect to such Distribution Date, (B) all Available Funds in respect of the related Distribution Date together with all amounts representing Prepayment Charges (payable to the Class P Certificateholders) from the Mortgage Loans received by the Servicer during the related Prepayment Period and (C) subject to Section 3.21(c), all income and gain realized from the investment of funds deposited in the Collection Account, for deposit in the Supplemental Float Account;

(ii) to reimburse the Servicer for P&I Advances, but only to the extent of amounts received which represent Late Collections (net of the related Servicing Fees) of Scheduled Payments on Mortgage Loans with respect to which such P&I Advances were made in accordance with the provisions of Section 4.01;

(iii) to pay to the Servicer or any Subservicer (A) any unpaid Servicing Fees or (B) any unreimbursed Servicing Advances with respect to each Mortgage Loan, but only to the extent of any Late Collections or other amounts as may be collected by the Servicer from a Mortgagor, or otherwise received with respect to such Mortgage Loan (or the related REO Property);

(iv) to pay to the Servicer as servicing compensation (in addition to the Servicing Fee) on each Remittance Date (A) subject to Section 3.21(c), any interest or investment income earned on funds deposited in the Collection Account or (B) any Prepayment Interest Excesses to the extent permitted under Section 3.21(b);

(v) to pay to the applicable Person, with respect to each Mortgage Loan that has previously been repurchased or replaced by such Person pursuant to this Agreement or the Sponsor Representation Letter, all amounts received thereon subsequent to the date of purchase or substitution, as the case may be;

(vi) to reimburse the Servicer for (A) any P&I Advance or Servicing Advance previously made which the Servicer has determined to be a Nonrecoverable P&I Advance or Nonrecoverable Servicing Advance in accordance with the provisions of Section 4.01 and (B) any unpaid Servicing Fees related to any Second Lien Mortgage Loan to the extent not recoverable from Liquidation Proceeds, Insurance Proceeds or other amounts received with respect to the related Second Lien Mortgage Loan under Section 3.11(a)(iii);

(vii) to pay, or to reimburse the Servicer for Servicing Advances in respect of, expenses incurred in connection with any Mortgage Loan pursuant to Section 3.15;

(viii) to reimburse the Servicer, the Depositor or the Trustee for expenses incurred by or reimbursable to the Servicer, the Depositor or the Trustee, as the case may be, pursuant to Section 6.03, Section 7.02 or Section 8.05;

(ix) to reimburse the Servicer or the Trustee, as the case may be, for expenses reasonably incurred in respect of the breach or defect giving rise to the repurchase obligation under this Agreement or the Sponsor Representation Letter that were included in the Repurchase Price of the Mortgage Loan, including any expenses arising out of the enforcement of the repurchase obligation, to the extent not otherwise paid pursuant to the terms hereof;

(x) to withdraw any amounts deposited in the Collection Account in error; and

(xi) to clear and terminate the Collection Account upon termination of this Agreement;

(xii) to withdraw any amounts held in the related Collection Account and not required to be remitted to the Trustee on the Remittance Date occurring in the month in which such amounts are deposited into such Collection Account, to reimburse such Servicer for unreimbursed P&I Advances; and

(xiii) to invest funds in Permitted Investments in accordance with Section 3.12.

(b) The Servicer shall keep and maintain separate accounting, on a Mortgage Loan by Mortgage Loan basis, for the purpose of justifying any withdrawal from the Collection Account, to the extent held by or on behalf of it, pursuant to subclauses (a)(ii), (iii), (v), (vi), (vii), (viii), (ix) and (x) above. The Servicer shall provide written notification (as set forth in Section 4.01(d)) to the Trustee, on or prior to the next succeeding Remittance Date, upon making any withdrawals from the Collection Account pursuant to subclause (a)(vi) above.

**Section 3.12 Investment of Funds in the Collection Account, Escrow Accounts and the Distribution Account.** (a) (i) The Servicer shall invest the funds in the Collection Account pursuant to Section 3.21(c) and (ii) the Servicer may invest the funds in the Collection Account pursuant to Section 3.21(c), the Servicer may invest the funds in the Escrow Accounts (to the extent permitted by Law and the related Mortgage Loan documents) and the Trustee may invest funds in the Distribution Account and shall invest such funds in the Distribution Account (for purposes of this Section 3.12, each such Account is referred to as an "_Investment Account_"), in one or more Permitted Investments bearing interest or sold at a discount, and maturing, unless payable on demand, no later than the Business Day immediately preceding the date on which such funds are required to be withdrawn from such account pursuant to this Agreement; provided, however, that any such Permitted Investment may mature, unless payable on demand or held at the institution of the Trustee, no later than one Business Day prior to the date on which such funds are required to be withdrawn from such account pursuant to this Agreement. If no investment instruction is given in a timely manner, the Trustee shall hold the funds in the Distribution Account uninvested. All such Permitted Investments shall be held to maturity, unless payable on demand. Any investment of funds in an Investment Account shall be made in the name of the Servicer or the Trustee, as applicable. The Servicer or the Trustee, as applicable, shall be entitled to sole possession over each such investment, and any certificate or other instrument evidencing any such investment shall be delivered directly to the Servicer or the Trustee or its agent, as applicable, together with any document of transfer necessary to transfer title to such investment to the Servicer or the Trustee or its agent, as applicable. In the event amounts on deposit in an Investment Account are at any time invested in a Permitted Investment payable on demand, the Servicer or the Trustee, as applicable, may:

(x) consistent with any notice required to be given thereunder, demand that payment thereon be made on the last day such Permitted Investment may otherwise mature hereunder in an amount equal to the lesser of (1) all amounts then payable thereunder and (2) the amount required to be withdrawn on such date; and

(y) demand payment of all amounts due thereunder that such Permitted Investment would not constitute a Permitted Investment in respect of funds thereafter on deposit in an Investment Account.

(b) All income and gain realized from the investment of funds deposited in the Collection Account (subject to Section 3.21(c)) or Escrow Account, as applicable, held by or on behalf of the Servicer, shall be for the benefit of the Servicer and shall be subject to its withdrawal in the manner set forth in Section 3.11. The Servicer shall, from its own funds, deposit in the Collection Account or Escrow Account, as applicable, the amount of any loss of principal incurred in respect of any such Permitted Investment made with funds in such accounts immediately upon realization of such loss.

(c) All income and gain realized from the investment of funds deposited in the Distribution Account held by the Trustee, shall be for the benefit of the Trustee, and shall be subject to the Trustee's withdrawal in the manner set forth in Section 3.07(e). The Trustee shall, from its own funds, deposit in the Distribution Account the amount of any loss of principal incurred in respect of any such Permitted Investment made with funds in such account immediately upon realization of such loss.

(d) Except as otherwise expressly provided in this Agreement, if any default occurs in the making of a payment due under any Permitted Investment of funds held in the Escrow Account or the Collection Account, or if a default occurs in any other performance required under any Permitted Investment of funds held in the Escrow Account or the Collection Account, the Servicer shall take such action as may be appropriate to enforce such payment or performance, including the institution and prosecution of appropriate proceedings.

**Section 3.13 Maintenance of Hazard Insurance and Errors and Omissions and Fidelity Coverage.** (a) The Servicer shall cause to be maintained for each Mortgage Loan fire insurance with extended coverage on the related Mortgaged Property in an amount which is at least equal to the least of (i) the outstanding principal balance of such Mortgage Loan, (ii) the amount necessary to fully compensate for any damage or loss to the improvements that are a part of such property on a replacement cost basis and (iii) the maximum insurable value of the improvements which are a part of such Mortgaged Property, in each case in an amount not less than such amount as is necessary to avoid the application of any coinsurance clause contained in the related hazard insurance policy. The Servicer shall also cause to be maintained fire insurance with extended coverage on each REO Property in an amount which is at least equal to the lesser of (i) the maximum insurable value of the improvements which are a part of such property and (ii) the outstanding principal balance of the related Mortgage Loan at the time it became an REO Property, plus accrued interest at the Mortgage Rate and related Servicing Advances. The Servicer will comply in the performance of this Agreement with all reasonable rules and requirements of each insurer under any such hazard policies. Any amounts to be collected by the

Servicer under any such policies (other than amounts required to be deposited in the Escrow Account and applied to the restoration or repair of the property subject to the related Mortgage or amounts to be released to the Mortgagor in accordance with the procedures that the Servicer would follow in servicing loans held for its own account, subject to the terms and conditions of the related Mortgage and Mortgage Note) shall be deposited in the Collection Account, subject to withdrawal pursuant to Section 3.11. Any cost incurred by the Servicer in maintaining any such insurance shall not, for the purpose of calculating distributions to the Trustee, be added to the unpaid principal balance of the related Mortgage Loan, notwithstanding that the terms of such Mortgage Loan so permit. It is understood and agreed that no earthquake or other additional insurance is to be required of any Mortgagor other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. If the Mortgaged Property or REO Property is at any time in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards and flood insurance has been made available, the Servicer will cause to be maintained a flood insurance policy in respect thereof. Such flood insurance shall be in an amount equal to the lesser of (i) the unpaid principal balance of the related Mortgage Loan and (ii) the maximum amount of such insurance available for the related Mortgaged Property under the national flood insurance program (assuming that the area in which such Mortgaged Property is located is participating in such program).

In the event that the Servicer shall obtain and maintain a blanket policy with an insurer either (i) acceptable to Fannie Mae or Freddie Mac or (ii) having a general policy rating of A:VI or better in Best's (or such other rating that is comparable to such rating) insuring against hazard losses on all of the Mortgage Loans, it shall conclusively be deemed to have satisfied its obligations as set forth in the first two sentences of this Section 3.13, it being understood and agreed that such policy may contain a deductible clause, in which case the Servicer shall, in the event that there shall not have been maintained on the related Mortgaged Property or REO Property a policy complying with the first two sentences of this Section 3.13, and there shall have been one or more losses which would have been covered by such policy, deposit to the Collection Account from its own funds the amount not otherwise payable under the blanket policy because of such deductible clause. In connection with its activities as administrator and servicer of the Mortgage Loans, the Servicer agrees to prepare and present, on behalf of itself and the Trustee, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy.

(b) The Servicer shall keep in force during the term of this Agreement a policy or policies of insurance covering errors and omissions for failure in the performance of the Servicer's obligations under this Agreement, which policy or policies shall be in such form and amount that would meet the requirements of Fannie Mae or Freddie Mac if it were the purchaser of the Mortgage Loans. The Servicer shall also maintain a fidelity bond in the form and amount that would meet the requirements of Fannie Mae or Freddie Mac, unless the Servicer has obtained a waiver of such requirements from Fannie Mae or Freddie Mac. The Servicer shall provide the Trustee with copies of any such insurance policies and fidelity bond. The Servicer shall be deemed to have complied with this provision if an Affiliate of the Servicer has such errors and omissions and fidelity bond coverage and, by the terms of such insurance policy or fidelity bond, the coverage afforded thereunder extends to the Servicer. Any such errors and omissions policy and fidelity bond shall by its terms not be cancelable without thirty days' prior written notice to the Trustee. The Servicer shall also cause each Subservicer to maintain a policy of insurance covering errors and omissions and a fidelity bond which would meet such requirements.

Section 3.14 Enforcement of Due-On-Sale Clauses; Assumption Agreements. The Servicer will, to the extent it has knowledge of any conveyance or prospective conveyance of any Mortgaged Property by any Mortgagor (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the maturity of such Mortgage Loan under the "due-on-sale" clause, if any, applicable thereto; provided, however, that the Servicer shall not be required to take such action if, in its sole business judgment, the Servicer believes it is not in the best interests of the Trust Fund and shall not exercise any such rights if prohibited by law from doing so. If the Servicer reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause or if any of the other conditions set forth in the proviso to the preceding sentence apply, the Servicer will enter into either (i) an assumption and modification agreement from or with the person to whom such property has been conveyed or is proposed to be conveyed, pursuant to which such person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon or (ii) a substitution agreement as provided in the succeeding sentence. The Servicer is also authorized to enter into a substitution of liability agreement with such person, pursuant to which the original Mortgagor is released from liability and such person is substituted as the Mortgagor and becomes liable under the Mortgage Note, provided, that no such substitution shall be effective unless such person satisfies the underwriting criteria of the Servicer and has a credit risk rating at least equal to that of the original Mortgagor. In connection with any assumption, modification or substitution, the Servicer shall apply such underwriting standards and follow such practices and procedures as shall be normal and usual in its general mortgage servicing activities and as it applies to other mortgage loans owned solely by it. The Servicer shall not take or enter into any assumption and modification agreement, however, unless (to the extent practicable in the circumstances) it shall have received confirmation, in writing, of the continued effectiveness of any applicable hazard insurance policy, or a new policy meeting the requirements of this Section is obtained. Any fee collected by the Servicer in respect of an assumption or substitution of liability agreement will be retained by the Servicer as additional servicing compensation. In connection with any such assumption, no material term of the Mortgage Note (including but not limited to the related Mortgage Rate and the amount of the Scheduled Payment) may be amended or modified, except as otherwise

required pursuant to the terms thereof. The Servicer shall notify the Trustee that any such substitution, modification or assumption agreement has been completed by forwarding to the Trustee the executed original of such substitution or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof.

Notwithstanding the foregoing paragraph or any other provision of this Agreement, the Servicer shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or by the terms of the Mortgage Note or any assumption which the Servicer may be restricted by law from preventing, for any reason whatsoever. For purposes of this Section 3.14, the term "assumption" is deemed to also include a sale (of the Mortgaged Property) subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.

**Section 3.15 Realization upon Defaulted Mortgage Loans.** The Servicer shall use its best efforts, consistent with Accepted Servicing Practices, to foreclose upon or otherwise comparably convert (which may include an acquisition of REO Property) the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 3.07, and which are not released from this Agreement pursuant to any other provision hereof. The Servicer shall use reasonable efforts to realize upon such defaulted Mortgage Loans in such manner as will maximize the receipt of principal and interest by the Trustee, taking into account, among other things, the timing of foreclosure proceedings; provided, however, with respect to any Second Lien Mortgage Loan for which the related first lien mortgage loan is not included in the Trust Fund, if, after such Mortgage Loan becomes 180 days or more delinquent, the Servicer determines that a significant net recovery is not possible through foreclosure, such Mortgage Loan may be charged off and the Mortgage Loan will be treated as a Liquidated Mortgage Loan giving rise to a Realized Loss. The foregoing is subject to the provisions that, in any case in which Mortgaged Property shall have suffered damage from an uninsured cause, the Servicer shall not be required to expend its own funds toward the restoration of such property unless it shall determine in its sole discretion (i) that such restoration will increase the net Liquidation Proceeds of the related Mortgage Loan to the Trustee, after reimbursement to itself for such expenses, and (ii) that such expenses will be recoverable by the Servicer through Insurance Proceeds, Condemnation Proceeds, Liquidation Proceeds or Subsequent Recoveries from the related Mortgaged Property, as contemplated in Section 3.11. The Servicer shall be responsible for all other costs and expenses incurred by it in any such proceedings; provided, however, that it shall be entitled to reimbursement thereof as contemplated in Section 3.11.

The proceeds of any liquidation or REO Disposition, as well as any recovery resulting from a partial collection of Insurance Proceeds, Condemnation Proceeds, Liquidation Proceeds or Subsequent Recoveries or any income from an REO Property, will be applied in the following order of priority: first, to reimburse the Servicer or any Subservicer for any related unreimbursed Servicing Advances, pursuant to Section 3.11 or 3.17; second, to reimburse the Servicer for any related unreimbursed P&I Advances, pursuant to Section 3.11; third, to accrued and unpaid interest on the Mortgage Loan or REO Imputed Interest, at the Mortgage Rate, to the date of the liquidation or REO Disposition, or to the Due Date prior to the Remittance Date on which such amounts are to be distributed if not in connection with a liquidation or REO Disposition; and fourth, as a recovery of principal of the Mortgage Loan. If the amount of the recovery so allocated to interest is less than a full recovery thereof, that amount will be allocated as follows: first, to unpaid Servicing Fees; and second, as interest at the Mortgage Rate (net of the Servicing Fee Rate). The portion of the recovery so allocated to unpaid Servicing Fees shall be reimbursed to the Servicer or any Subservicer pursuant to Section 3.11 or 3.17. The portions of the recovery so allocated to interest at the Mortgage Rate (net of the Servicing Fee Rate) and to principal of the Mortgage Loan shall be applied as follows: first, to reimburse the Servicer or any Subservicer for any related unreimbursed Servicing Advances in accordance with Section 3.11 or 3.17, and second, to the Trustee in accordance with the provisions of Section 4.02, subject to paragraph (g) of Section 3.17 with respect to certain excess recoveries from an REO Disposition.

Notwithstanding anything to the contrary contained herein, in connection with a foreclosure or acceptance of a deed in lieu of foreclosure, in the event the Servicer has received actual notice of, or has actual knowledge of the presence of, hazardous or toxic substances or wastes on the related Mortgaged Property, or if the Trustee otherwise requests, the Servicer shall cause an environmental inspection or review of such Mortgaged Property to be conducted by a qualified inspector. Upon completion of the inspection, the Servicer shall promptly provide the Trustee and the Depositor with a written report of the environmental inspection.

After reviewing the environmental inspection report, the Servicer shall determine consistent with Accepted Servicing Practices how the Servicer shall proceed with respect to the Mortgaged Property. In the event (a) the environmental inspection report indicates that the Mortgaged Property is contaminated by hazardous or toxic substances or wastes and (b) the Servicer proceeds with foreclosure or acceptance of a deed in lieu of foreclosure, the Servicer shall be reimbursed for all reasonable costs associated with such foreclosure or acceptance of a deed in lieu of foreclosure and any related environmental clean-up costs, as applicable, from the related Liquidation Proceeds, or if the Liquidation Proceeds are insufficient to fully reimburse the Servicer, the Servicer shall be entitled to be reimbursed from amounts in the Collection Account pursuant to Section 3.11. In the event the Servicer does not proceed with foreclosure or acceptance of a deed in lieu of foreclosure, the Servicer shall be reimbursed from general collections for all Servicing Advances made with respect to the related Mortgaged Property from the Collection Account

pursuant to Section 3.11.

**Section 3.16 Release of Mortgage Files.** (a) Upon the payment in full of any Mortgage Loan, or the receipt by the Servicer of a notification that payment in full shall be escrowed in a manner customary for such purposes, the Servicer will, within five (5) Business Days of the payment in full, notify the Trustee by a certification (which certification shall include a statement to the effect that all amounts received or to be received in connection with such payment which are required to be deposited in the Collection Account pursuant to Section 3.10 have been or will be so deposited) of a Servicing Officer and shall request delivery to it of the Custodial File by submitting a Request for Release, which Request for Release may be in an electronic format in a form acceptable to the Trustee, to the Trustee. Upon receipt of such certification and Request for Release, the Trustee shall promptly release the related Custodial File to the Servicer within two (2) Business Days. No expenses incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Collection Account unless such expenses constitute Servicing Advances.

(b) From time to time and as appropriate for the servicing or foreclosure of any Mortgage Loan, including, for this purpose, collection under any Insurance Policy relating to the Mortgage Loans, the Trustee shall, upon request of the Servicer and delivery to the Trustee of a Request for Release, which Request for Release may be in an electronic format in a form acceptable to the Trustee, release the related Custodial File to the Servicer within three (3) Business Days, and the Trustee shall, at the direction of the Servicer, execute such documents as shall be necessary to the prosecution of any such proceedings and the Servicer shall retain the Mortgage File in trust for the benefit of the Trustee. Such Request for Release shall obligate the Servicer to return each and every document previously requested from the Custodial File to the Trustee when the need therefor by the Servicer no longer exists, unless the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Collection Account or the Mortgage File or such document has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially, and the Servicer has delivered to the Trustee a certificate of a Servicing Officer certifying as to the name and address of the Person to which such Mortgage File or such document was delivered and the purpose or purposes of such delivery. Upon receipt of a certificate of a Servicing Officer stating that such Mortgage Loan was liquidated and that all amounts received or to be received in connection with such liquidation that are required to be deposited into the Collection Account have been so deposited, or that such Mortgage Loan has become an REO Property, a copy of the Request for Release shall be released by the Trustee to the Servicer or its designee.

Upon written certification of a Servicing Officer, the Trustee shall execute and deliver to the Servicer copies of any court pleadings, requests for trustee's sale or other documents reasonably necessary to the foreclosure or trustee's sale in respect of a Mortgaged Property or to any legal action brought to obtain judgment against any Mortgagor on the Mortgage Note or Mortgage or to obtain a deficiency judgment, or to enforce any other remedies or rights provided by the Mortgage Note or Mortgage or otherwise available at law or in equity, or shall exercise and deliver to the Servicer a power of attorney sufficient to authorize the Servicer to execute such documents on its behalf. Each such certification shall include a request that such pleadings or documents be executed by the Trustee and a statement as to the reason such documents or pleadings are required and that the execution and delivery thereof by the Trustee will not invalidate or otherwise affect the lien of the Mortgage, except for the termination of such a lien upon completion of the foreclosure or trustee's sale.

**Section 3.17 Title, Conservation and Disposition of REO Property.** (a) This Section shall apply only to REO Properties acquired for the account of the Trustee and shall not apply to any REO Property relating to a Mortgage Loan which was purchased or repurchased from the Trustee pursuant to any provision hereof. In the event that title to any such REO Property is acquired, the deed or certificate of sale shall be issued to Wells Fargo Bank, National Association (or, if applicable, the name of the successor Trustee) as Trustee for Securitized Asset Backed Receivables LLC 2006-WM2 Mortgage Pass-Through Certificates, Series 2006-WM2, or to its nominee, for the benefit of the Certificateholders.

(b) The Servicer shall manage, conserve, protect and operate each REO Property for the Trustee solely for the purpose of its prompt disposition and sale. The Servicer, either itself or through an agent selected by the Servicer, shall manage, conserve, protect and operate the REO Property in the same manner that it manages, conserves, protects and operates other foreclosed property for its own account, and in the same manner that similar property in the same locality as the REO Property is managed. The Servicer shall attempt to sell the same (and may temporarily rent the same for a period not greater than one year, except as otherwise provided below) on such terms and conditions as the Servicer deems to be in the best interest of the Trustee on behalf of the Certificateholders. The Servicer shall notify the Trustee from time to time as to the status of each REO Property.

(c) The Servicer shall use its best efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within three years after title has been taken to such REO Property, unless the Servicer determines, and gives an appropriate notice to the Trustee to such effect, that a longer period is necessary for the orderly liquidation of such REO Property. Subject to Section 3.17(h), if a period longer than three years is permitted under the foregoing sentence and is necessary to sell any REO Property, the Servicer shall report monthly to the Trustee as to the progress being made in selling such REO Property.

(d) The Servicer shall segregate and hold all funds collected and

received in connection with the operation of any REO Property separate and apart from its own funds and general assets and shall deposit such funds in the Collection Account.

(e) The Servicer shall deposit net of reimbursement to the Servicer for any related outstanding Servicing Advances and unpaid Servicing Fees provided in Section 3.11, or cause to be deposited, in no event more than two (2) Business Days after the Servicer's receipt thereof, in the Collection Account all revenues received with respect to the related REO Property and shall withdraw therefrom funds necessary for the proper operation, management and maintenance of the REO Property.

(f) The Servicer, upon an REO Disposition, shall be entitled to reimbursement for any related unreimbursed Servicing Advances as well as any unpaid Servicing Fees from proceeds received in connection with the REO Disposition, as further provided in Section 3.11.

(g) Any net proceeds from an REO Disposition which are in excess of the unpaid principal balance of the related Mortgage Loan plus all unpaid REO Imputed Interest thereon through the date of the REO Disposition shall be retained by the Servicer as additional servicing compensation.

(h) The Servicer shall use its reasonable best efforts to sell, or cause the Subservicer to sell, in accordance with Accepted Servicing Practices, any REO Property as soon as possible, but in no event later than the conclusion of the third calendar year beginning after the year of its acquisition by Pooling Tier REMIC-1 unless (i) the Servicer applies for an extension of such period from the Internal Revenue Service pursuant to the REMIC Provisions and Code Section 856(e)(3), in which event such REO Property shall be sold within the applicable extension period, or (ii) the Servicer obtains for the Trustee an Opinion of Counsel, addressed to the Depositor, the Trustee and the Servicer, to the effect that the holding by Pooling Tier REMIC-1 of such REO Property subsequent to such period will not result in the imposition of taxes on "prohibited transactions" as defined in Section 860F of the Code or cause any Trust REMIC to fail to qualify as a REMIC under the REMIC Provisions or comparable provisions of relevant state laws at any time. The Servicer shall manage, conserve, protect and operate each REO Property for the Trustee, the Certificateholders and the Trust Fund solely for the purpose of its prompt disposition and sale in a manner which does not cause such REO Property to fail to qualify as *"foreclosure property"* within the meaning of Section 860G(a)(8) or result in the receipt by the Pooling Tier REMIC-1 of any *"income from non-permitted assets"* within the meaning of Section 860F(a)(2)(B) of the Code or any *"net income from foreclosure property"* which is subject to taxation under Section 860G(a)(1) of the Code. Pursuant to its efforts to sell such REO Property, the Servicer shall either itself or through an agent selected by the Servicer protect and conserve such REO Property in the same manner and to such extent as is customary in the locality where such REO Property is located and may, incident to its conservation and protection of the interests of the Trustee on behalf of the Certificateholders, rent the same, or any part thereof, as the Servicer deems to be in the best interest of the Trustee on behalf of the Certificateholders for the period prior to the sale of such REO Property; provided, however, that any rent received or accrued with respect to such REO Property qualifies as *"rents from real property"* as defined in Section 856(d) of the Code.

**Section 3.18 Notification of Adjustments.** With respect to each Adjustable Rate Mortgage Loan, the Servicer shall adjust the Mortgage Rate on the related Adjustment Date and shall adjust the Scheduled Payment on the related mortgage payment adjustment date, if applicable, in compliance with the requirements of applicable law and the related Mortgage and Mortgage Note. In the event that an Index becomes unavailable or otherwise unpublished, the Servicer shall select a comparable alternative index over which it has no direct control and which is readily verifiable. The Servicer shall execute and deliver any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Rate and Scheduled Payment adjustments. The Servicer shall promptly, upon written request therefor, deliver to the Trustee such notifications and any additional applicable data regarding such adjustments and the methods used to calculate and implement such adjustments. Upon the discovery by the Servicer or the receipt of notice from the Trustee that the Servicer has failed to adjust a Mortgage Rate or Scheduled Payment in accordance with the terms of the related Mortgage Note, the Servicer shall deposit in the Collection Account from its own funds the amount of any interest loss caused as such interest loss occurs.

**Section 3.19 Access to Certain Documentation and Information Regarding the Mortgage Loans.** In the event the Servicer reasonably believes that compliance with this Section will make the Mortgage Loans legal for investment by federally insured savings and loan associations, the Servicer shall provide, or cause the Subservicer to provide, to the Depositor, the Trustee, the OTS or the FDIC and the examiners and supervisory agents thereof, access to the documentation regarding the Mortgage Loans in its possession required by applicable regulations of the OTS. Such access shall be afforded without charge, but only upon reasonable and prior written request and during normal business hours at the offices of the Servicer or, if applicable, any Subservicer. Nothing in this Section shall derogate from the obligation of any such party to observe any applicable law prohibiting disclosure of information regarding the Mortgagors and the failure of any such party to provide access as provided in this Section as a result of such obligation shall not constitute a breach of this Section.

**Section 3.20 Documents, Records and Funds in Possession of the Servicer to Be Held for the Trustee.** The Servicer shall account fully to the Trustee for any funds received by the Servicer or which otherwise are collected by the Servicer as Liquidation Proceeds, Condemnation Proceeds or Insurance Proceeds in respect of any Mortgage Loan serviced by the Servicer. All Mortgage Files and funds collected or held by, or under the control of, the Servicer in respect of any Mortgage Loans, whether from the collection of principal and

interest payments or from Liquidation Proceeds, including, but not limited to, any funds on deposit in its Collection Account, shall be held by the Servicer for and on behalf of the Trustee and shall be and remain the sole and exclusive property of the Trustee, subject to the applicable provisions of this Agreement. The Servicer also agrees that it shall not create, incur or subject any Mortgage File or any funds that are deposited in any Collection Account, the Distribution Account or any Escrow Account, or any funds that otherwise are or may become due or payable to the Trustee for the benefit of the Certificateholders, to any claim, lien, security interest, judgment, levy, writ of attachment or other encumbrance, or assert by legal action or otherwise any claim or right of setoff against any Mortgage File or any funds collected on, or in connection with, a Mortgage Loan, except, however, that the Servicer shall be entitled to set off against and deduct from any such funds any amounts that are properly due and payable to the Servicer under this Agreement.

Section 3.21 **Servicing Compensation.** (a) As compensation for its activities hereunder, the Servicer shall, with respect to each Mortgage Loan, be entitled to retain from deposits to the Collection Account and from Liquidation Proceeds, Condemnation Proceeds, Insurance Proceeds, Subsequent Recoveries and REO Proceeds related to such Mortgage Loan, the Servicing Fee with respect to each Mortgage Loan (less any portion of such amounts retained by any Subservicer). In addition, the Servicer shall be entitled to recover unpaid Servicing Fees out of related Late Collections and as otherwise permitted under Section 3.11. The right to receive the Servicing Fee may not be transferred in whole or in part except in connection with the transfer of all of the Servicer's responsibilities and obligations under this Agreement; provided, however, that the Servicer may pay from the Servicing Fee any amounts due to a Subservicer pursuant to a Subservicing Agreement entered into under Section 3.02.

(b) Additional servicing compensation in the form of assumption or modification fees, late payment charges, net Prepayment Interest Excesses (to the extent not required to offset Prepayment Interest Shortfalls), NSF fees, reconveyance fees and other similar fees and charges (other than Prepayment Charges) shall be retained by the Servicer only to the extent such fees or charges are received by the Servicer. The Servicer shall also be entitled as additional servicing compensation, to interest or other income earned on deposits in the Escrow Account (to the extent permitted by law and the related Mortgage Loan documents) in accordance with Section 3.12.

(c) The Servicer shall also be entitled pursuant to Section 3.11(a)(iv) to withdraw from the Collection Account as additional servicing compensation, interest or other income earned on deposits therein; provided, however, that in the event that the purchase by Barclays of HomEq's servicing division is consummated by December 31, 2006, and so long as HomEq is the Servicer, the Servicer shall remit to the Trustee for deposit in the Supplemental Float Account all income and gain realized from the investment of funds deposited in the Collection Account.

(d) The Servicer shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder (including payment of premiums for any blanket policy insuring against hazard losses pursuant to Section 3.13, servicing compensation of the Subservicer to the extent not retained by it and the fees and expenses of independent accountants and any agents appointed by the Servicer), and shall not be entitled to reimbursement therefor from the Trust Fund except as specifically provided in Section 3.11.

Section 3.22 **Annual Statement as to Compliance.** The Servicer shall deliver, and shall cause each Subservicer engaged by the Servicer to deliver or cause to be delivered, and the Trustee shall deliver, to the Depositor, the Rating Agencies and the Trustee on or before March 5th of each calendar year, commencing in 2007, an Officer's Certificate stating, as to each signatory thereof, that (i) a review of the activities of the Trustee, Servicer or Subservicer, as applicable, during the preceding calendar year and of its performance under this Agreement or the applicable Subservicing Agreement, as the case may be, has been made under such officer's supervision, and (ii) to the best of such officer's knowledge, based on such review, the Trustee, Servicer or Subservicer, as applicable, has fulfilled all of its obligations under this Agreement or the applicable Subservicing Agreement, as the case may be, in all material respects, throughout such year, or, if there has been a failure to fulfill any such obligation in any material respect, specifying each such failure known to such officers and the nature and status thereof. Promptly after receipt of each such Officer's Certificate, the Depositor shall review such Officer's Certificate and, if applicable, consult with the Trustee, Servicer or Subservicer as to the nature of any failure by the Trustee, Servicer or Subservicer in the fulfillment of any of the Trustee's, Servicer's or Subservicer's obligations. The obligations of the Trustee, Servicer and Subservicer under this Section apply to each Trustee, Servicer and Subservicer that acted as Trustee or serviced a Mortgage Loan, as applicable, during the applicable period, whether or not the Trustee, the Servicer or such Subservicer is acting as the Trustee, Servicer or Subservicer, as applicable, at the time such Officer's Certificate is required to be delivered. None of the Trustee, Servicer or Subservicer shall be required to cause the delivery of any Officer's Certificate required by this Section until March 15th in any given year so long as it has received written confirmation from the Depositor that a Form 10-K is not required to be filed in respect of the Trust for the preceding calendar year.

In the event the Servicer, the Trustee or any Subservicer engaged by the Servicer is terminated or resigns pursuant to the terms of this Agreement, or any applicable agreement in the case of a Subservicer, as the case may be, such party shall provide with respect to the year of termination an Officer's Certificate pursuant to this Section 3.22 or to such applicable agreement, as the case may be, notwithstanding any such termination, assignment or resignation, but only covering the period prior to such termination.

Section 3.23 **Annual Reports on Assessment of Compliance with Servicing Criteria; Annual Independent Public Accountants' Attestation Report.**

resolution, these other cases highlight the risk of inconsistent judgments and therefore

underscore the need for guidance from the Ohio Supreme Court. From an efficiency

standpoint, it makes no sense to engage in years of discovery and litigation in multiple

venues before addressing whether this statute even applies to mortgage servicers when

this issue can be resolved upfront through the certification process. That is particularly

so in this case, where the questions to be certified involve pure questions of law. As is

evident from the briefs, the application of the CSPA involves nothing other than a pure

question of law and it is only now, in an attempt to avoid certification of this question,

that Plaintiff attempts to fabricate factual issues which do not exist.

In sum, certifying these questions to the Ohio Supreme Court therefore

will enhance judicial economy in multiple venues and permit the parties and the State of

Ohio to avoid undue delay, burden, and expenses associated with lengthy discovery and

litigation.

## II.     Language for Certification to the Supreme Court

During the parties' meet and confer teleconference, Plaintiff and

Defendant agreed that should this Court certify the CSPA issue to the Ohio Supreme

Court, the questions to be certified should be as follows:

The Ohio Consumer Sales Practices Act, R.C. § 1345.01(C) ("CSPA")

defines a "supplier" as:

> a seller, lessor, assignor, franchisor, or other person engaged in the
> business of effecting or soliciting consumer transactions, whether or not
> the person deals directly with the consumer. If the consumer transaction is
> in connection with a residential mortgage, "supplier" does not include an
> assignee or purchaser of the loan for value, except as otherwise provided
> in section 1345.091 of the Revised Code. For purposes of this division, in
> a consumer transaction in connection with a residential mortgage, "seller"

6



STATE'S
EXHIBIT
L
PENGAD 800-631-6989

means a loan officer, mortgage broker, or nonbank mortgage lender. R.C. § 1345.01(C).

The CSPA defines a "consumer transaction" as:

a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things. "Consumer transaction" does not include transactions between persons, defined in sections 4905.03 and 5725.01 of the Revised Code, and their customers, except for transactions involving a loan made pursuant to sections 1321.35 to 1321.48 of the Revised Code and transactions in connection with residential mortgages between loan officers, mortgage brokers, or nonbank mortgage lenders and their customers; transactions between certified public accountants or public accountants and their clients; transactions between attorneys, physicians, or dentists and their clients or patients; and transactions between veterinarians and their patients that pertain to medical treatment but not ancillary services. R.C. § 1345.01(A).

*Issue*: Whether the Ohio Consumer Sales Practices Act, R.C. § 1345.01 et seq., provides a cause of action against entities that service residential mortgage loans.

*Question 1*:  Are entities that service residential mortgage loans "suppliers" as defined in the Ohio Consumer Sales Practices Act, R.C. § 1345.01(C)?

*Question 2*: Does the servicing of a borrower's residential mortgage loan constitute a "consumer transaction" as defined in R.C. § 1345.01(A)?

\* \* \* \* \* \*

Respectfully submitted,

*/s/James D. Curphey*
James D. Curphey (0015832)
Megan E. Bailey (0081167)
Michael A. Wehrkamp (0084942)
Porter Wright Morris & Arthur LLP
Huntington Center
41 South High Street
Columbus, OH 43215-6194
Phone: 614.227.2047

7